393 A.2d 1212

**Andreas FRIESTAD, t/a Superior Heating Company, Appellant,**

**and**

**Sears, Roebuck & Company, Intervenor,**

**v.**

**The TRAVELERS INDEMNITY COMPANY.**

**Appeal of Andreas Friestad**

Superior Court of Pennsylvania.

Argued April 12, 1978.

Decided Oct. 20, 1978.

Henry E. Sewinsky, Sharon, for appellant.

P. Raymond Bartholomew, Sharon, for appellees.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

CERCONE, Judge:

The instant appeal arises from an order entered in favor of Travelers Insurance Co. on a petition for a declaratory judgment filed by Andreas Friestad, trading as Superior Heating Co. The declaratory judgment action was instituted to determine whether an insurance policy which Friestad purchased from Travelers allowed indemnification for damages with Sears Roebuck & Co. incurred due to the faulty installation of a Sears' furnace in the home of Mr. and Mrs. Chauncy Thompson. The installation of the furnace, a job which Friestad's company performed pursuant to a contract with Sears, caused a fire which completely destroyed the Thompson's home and its contents. In prior litigation the Thompsons received a judgment in the amount of $20,134.78 including costs against Sears. After satisfying the judgment, Sears filed a complaint in assumpsit against Friestad t/a Superior Heating Co. demanding indemnification plus $10,672.14 in attorneys' fees and costs Sears incurred in defending the Thompson's lawsuit. Friestad notified its insurer, Travelers, of the claim but Travelers denied cover-

age and refused to provide a defense. Friestad thereupon filed the instant declaratory judgment action.[1]

On or about April 28, 1967, Andreas Friestad t/a Superior Heating Co. purchased a comprehensive business owners insurance policy from The Travelers through a local insurance agency in Sharon, Pa. With respect to the kind of liability for which Friestad herein seeks coverage, the contract provided:

"Coverage D—Liability—The Travelers agrees to pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this Section applies, caused by an occurrence, or personal injury caused by an offense committed during the period insurance under this Section is in effect within the United States of America, its territories or possessions or Canada; and The Travelers shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but The Travelers shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of The Travelers' liability has been exhausted by payment of judgments or settlements."

While this coverage as stated is broad, it is subject to a number of exclusions in the policy for particular kinds of risks or hazards for which premiums must be separately paid if coverage is to be afforded for such risks. Adumbrated in the insurance contract as follows, the six such hazards are: (a) Premises-Operations; (b) Elevators; (c) Independent

---

1. This case has been before the court previously on the question of whether the declaratory judgment action was premature. We affirmed the hearing court's determination on preliminary objections that it was not ripe for adjudication, but the Supreme Court reversed and remanded for further proceedings. *Friestad v. Travelers Indemn. Co.,* 222 Pa.Super. 559, 295 A.2d 135 (1972), *rev'd* 452 Pa. 417, 306 A.2d 295 (1973).

Contractors; (d) Completed Operations; (e) Products; and (f) Other-Describe. For reasons which will become clear hereinafter, it is the juxtaposition of the hazards entitled Premises-Operations, Completed-Operations and Products which cause the coverage problem posed in the instant case.[2]

The insurance question we face springs from the evolution of products liability law in tort and the concomitant need of businessmen to be insured for such liability. In days prior to the blossoming of strict liability in tort for defective products, the prerequisites of proving a manufacturer's negligence as well as privity of contract usually offered an insurmountable barrier for the injured consumer and effectively insulated the manufacturer, and others in the distributive chain from liability for defective products. Thus, aside from his liability as an employer, the businessman's greatest need for insurance arose from the maintenance of his business premises, including his work thereon, and his operations away from his regular business premises, but only during the course of his performance of such operations. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb.L.R. 415, 416–17 (1971). [Hereinafter, Henderson, 50 Neb.L.R. at ——.] As the businessman's risk of liability for defective products and workmanship grew, so did his need for insurance coverage for such potential liability. *Id.*

**2.** Although the insurance policy language defining the premises-operations hazard, completed operations hazard and products hazard will be set forth and discussed fully hereinafter, for the sake or understanding the intervening discussion, it is helpful to know, in general terms, what coverage these hazards exclude if the insured elects not to purchase them. "Premises-operations" refers to injuries or losses which occur on the business premises at any time, as well as injuries or losses which arise away from the normal business premises, such as a jobsite, but only during the time that those other premises are under the insured's control. "Completed Operations" supplements "premises-operations" and refers to injuries or losses which arise after a jobsite has been returned to the control of the premises' owner. The "Products Hazard" also requires the insured's relinquishment of control of a product, coupled with an injury or loss away from the normal business premises. The principal thrust of completed operations is the insured's provision of a service, while the principal thrust of the products hazard is the insured's manufacture or sale of a product.

Since then, the development of the law of products liability insurance has witnessed the insurance companies' efforts to draft its comprehensive business owners insurance policies, first, to provide such liability coverage for those who wished to purchase it, and second, to segregate the hazards, and consequently the premiums charged therefor, which arose from either the manufacture, sale, handling or use of a product *per se*, [i. e., the products hazard] as opposed to the hazard which arose principally from the performance of a service [i. e., the completed operations hazard]. See Annotation, *Construction and Application of Clause Excluding From Coverage of Liability Policy "Completed Operations Hazard,"* 58 A.L.R.3d 12, 19–20 (1973). [Hereinafter, Annot., 58 A.L.R.3d at ——.] With regard to the insurance companies' efforts to segregate what is commonly called the "Products Hazard" from the "Completed Operations Hazard," prior to 1966 the insurance companies were not only unsuccessful, but their attempts at defining these exclusions were often counterproductive. In most instances the companies listed both hazard exclusions as two separately numbered paragraphs under a common division entitled "Products Hazard," or "Products-Completed Operations Hazard." Henderson, 50 Neb.L.R. at 419. The result of this rubric, which proved maladroit, was that courts often held insurance companies liable under insurance policies for damages which arose from the insureds' contracting work subsequent to the insureds' completion of the work, and despite the fact that it was away from their business premises. See, e. g., Annot., 58 A.L.R.3d at 28–33. (Collecting cases.) Since this was the kind of liability which the companies considered to be within the completed operations hazard, obviously their efforts to exclude such liability from the general coverage provisions was ineffectual. This was principally because the general topic heading in the insurance contract under which the completed operations hazard appeared was entitled, "Products Hazard," or "Products-Completed Operations Hazard" (singular), so that coverage under the general liability provisions of the policy was only excluded if the work performed *principally* involved the manufacture, sale, han-

dling or use of a product, rather than the performance of a service, such as installation of a product which the insured did not sell or manufacture. See Henderson, 50 Neb.L.R. at 421–22. Since the majority of the courts required the involvement of the "insured's product" as a prerequisite to applying the completed operations exclusion, and since the involvement of the insured's product triggered as well the applicability of the products hazard exclusion, the effect of the majority view was that the complete operations hazard was superfluous. Only a minority of the courts accepted the view which the insurance companies had argued, that the completed operations hazard applied to all completed operations away from the business premises regardless of the absence of the manufacture or sale of a product *per se*. *Id.* at 424. Obviously, the majority of the courts relied upon the rule that, if there were any ambiguity concerning the existence of coverage, the insurance contract would be construed in favor of the insured. See, e. g., *Morris v. Western Cas. & Sur. Co.,* 421 S.W.2d 19 (Mo.App.1967).[3]

Given the majority view which emasculated the completed operations exclusion, in 1966 most policies were rewritten to more effectively sever the products hazard from the completed operations hazard so that the exclusions would not be redundant. Consequently, even under the majority view, it would be possible to purchase protection against one of these hazards and not the other. On the other hand, a new problem of construction arose: What risks were covered by the Products Hazard which were not covered by the Completed Operations Hazard, and vice versa? Henderson, 50 Neb.L.R. at 426. That is the novel question, not heretofore decided in Pennsylvania, which the instant case raises.[4]

**3.** As one court quaintly stated:

"The plaintiff gave the [insured] coverage in a single, simple sentence easily understood by the common man in the market place. It attempted to take away a portion of this same coverage in paragraphs and language which even a lawyer, be he from Philadelphia or Bungy, would find it difficult to comprehend." *Peerless Ins. Co. v. Clough,* 105 N.H. 76, 193 A.2d 444, 449 (1963).

**4.** The reason for the preceding historical narrative is to indicate that the overwhelming majority of cases which have discussed the prod-

Based upon the notations on the insurance policy in this case, two preliminary determinations are irrebuttable. First, Mr. Friestad purchased premises-operations coverage because the premium, based upon the square footage of his sheet metal shop, was listed on the policy opposite such coverage, and was concededly paid by Mr. Friestad. The second conclusion is that Mr. Friestad rejected products hazard coverage, for typed in large capital letters opposite that hazard is the notation, "Coverage Excluded." In the spaces similarly adjoining the additional exclusion of the Completed Operations Hazard, as well as the exclusions labeled Elevators, Independent Contractors, and Other-Describe, there is no entry whatsoever. At the hearing below, however, the court deemed it unnecessary to determine whether the absence of an entry indicated coverage for the completed operations hazard, because the hearing court determined the installation of the Sears furnace, from which Mr. Friestad's liability allegedly arose, fell within the meaning of the products hazard for which coverage was patently excluded. We find this conclusion erroneous.

The insurance policy at issue defines products hazard and completed operations hazard as follows.

"2. (h)(1) The term *products hazard* includes bodily injury and *property damage arising out of the Named Insured's products* or reliance upon a representation or warranty made at any time with respect thereto, *but only if* the bodily injury or property *damage occurs away from the premises* owned or rented to the Named Insured and

ucts hazard and completed operations hazard are inapposite for our purposes because those cases, which are indeed numerous, posed the problem of whether a particular accident fell within the "Products-Completed Operations Hazard" exclusion. If the accident did not fall within that single exclusion, then coverage obtained either under the general liability provisions or the "Premises-Operations Hazard." Because it was usually immaterial whether the accident resembled a products hazard or completed operations hazard, the interface of these two exclusions needed not to be clearly demarked. See, e. g., *Lumbermen's Mut. Cas. Co. v. Pattee*, 108 N.H. 298, 234 A.2d 537 (1967); *Gehrlein Tire Co. v. American Employers Ins. Co.*, 243 F.Supp. 577 (W.D.Pa.1964), aff'd 348 F.2d 918 (3d Cir. 1965).

*after physical possession of such products have been relinquished to others ;* [5]

"(h)(2) the term *'completed operations hazard'* includes bodily injury and *property damage arising out of operations* or reliance upon a representation or warranty made at any time with respect thereto, *but only* if the bodily injury or *property damage occurs after such operations have been completed or abandoned and occurs away from premises owned* or rented to the Named Insured. *'Operations'* include *materials, parts or equipment furnished in connection* therewith. Operations shall be deemed completed at the earliest of the following times; (i) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed; (ii) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed; or (iii) when the portion of the work out of which the injury or damage arises has been put in its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.[6]

5. For the sake of clarity, the purpose for this language should be recalled. The first portion of the clause is designed to differentiate the products hazard from the completed operations hazard, while the second portion of the clause is designed to differentiate the products hazard from the premises operations hazard. Regardless of the involvement of the insured's products, so long as an accident occurs on the insured's business premises or away from his premises, but while he has the jobsite under his control, the premises operations clause obtains and coverage is afforded thereunder. It is only after he has *relinquished control of a jobsite that the products hazard or* completed operations hazard exclusions will operate to deny coverage.

6. This sentence, as well as the sentence which follows, were included in an effort to obviate the difficult problem which has arisen in determining whether "operations" have been completed or not. Cases which treat this problem can be found in Henderson, 50 Neb.L.R. at 434–38; Annot. 58 A.L.R.3d at 38–57. If an operation is deemed to have been incomplete at the time of the accident, the completed operations exclusion does not apply and coverage is afforded under the premises-operation clause. See, e. g., *Eastcoast*

*"Operations which may require further service or mainte-nance work, or correction, repair, or replacement* because of any defect or deficiency, but which are otherwise complete, *shall be deemed complete."* [Emphasis added throughout.]

In addition, the policy defines "Named Insured's products" as "goods or products manufactured, sold, *handled* or distrib-uted by the Named Insured or others trading under his name. . . ." Thus, it can be seen that the Sears furnace becomes a Friestad product for the purpose of determining coverage if the term "handled" is given a broad meaning; surely Friestad's employees "handled" the furnace in the process of installing it. Under such a definition of "handled," the liability Sears asserts against Friestad would fall within the products hazard exclusion and bar Friestad's recovery against Travelers, because this coverage was spe-cifically excluded. Citing *Leakakos Construction Co., Inc. v. American Sur. Cas. Co. of N.Y.,* 8 Ill.App.3d 842, 291 N.E.2d 176 (Ill.1972), this is the conclusion the hearing court reached.[7] Our disagreement with the hearing court's inter-pretation of the insurance policy is that there is a more plausible reading of the policy which would place Friestad's alleged liability to Sears within the completed operations hazard and, at least potentially, afford coverage.

First, the hearing court's broad reading of the term "handled" renders coverage under the completed operations hazard virtually illusory. As appellant argues in his brief, it is difficult to conceive of a service which does not involve the handling of some object, so that, arguably, even the

*Equipment Co. v. Maryland Cas. Co.,* 38 Pa.D. & C.2d 499 (1965), aff'd 207 Pa.Super. 383, 218 A.2d 91 (1966).

7. As appellant points out, *Leakakos* is readily distinguishable from the instant case, however. In *Leakakos* the insured not only install-ed the incinerator and chimney system which was defective, he also had sold it. Thus, there existed a far stronger case for finding that the insured's installation of the incinerator and chimney fell within the ambit of the "Products-Completed Operations Hazard." Under similar circumstances a North Dakota court was impelled to the same conclusion. See *Haugen v. Auto-Owners Ins. Co.,* 191 N.W.2d 274 (N.D.1971).

"purest" of service-type operations from which liability might arise could be categorized as excluded under the products hazard. Doubtless, this interpretation would elude the most astute businessman's reading of his policy and result in the denial of coverage under circumstances where one reasonably expected coverage to obtain. Compare *Beckham v. Travelers Ins. Co.*, 424 Pa. 107, 117–18, 225 A.2d 532 (1967). This is so because the terms "goods" and "products" in the commercial world imply the creation of tangible items, and persons principally engaged in the installation of products manufactured or sold by another reasonably perceive themselves as being engaged in the provision of a service. Henderson, 50 Neb.L.R. at 429. Hence, it is more preferable by far to define the products hazard in terms of products liability law, and apply the exclusion only when a product, rather than a service, is the *cause in fact* of damages or injury to a third person. *Id.* at 430–31, 434. See also 12 Couch on Insurance § 44.414 (2d ed. 1964).[8]

█ In addition, a narrow reading of the term "handled" in this case has other advantages. Recalling the definitions of "products hazard" and "completed operations hazard," and assuming Friestad did indeed contract for completed operations coverage, a question which will be discussed more fully below, he would naturally expect that he had coverage for liability "arising out of [his] operations" in installing a furnace, but that he would not have coverage for liability "arising out of" his manufacturing or selling a furnace. Coupled with the fact that the operations definition refers to "operations which may require further service or maintenance work, or correction, repair, or replacement," and includes operations involving the furnishing of "materials, parts or equipment," it is inconceivable that the handling of a product was not contemplated as falling within the completed operations provision. Necessarily, if handling a prod-

8. For example, if a defect in the Sears furnace itself had caused the fire, Friestad clearly would not have been covered, for surely this would have been a products hazard. However, Friestad would not need such coverage under those circumstances because Sears would have been solely liable to the Thompsons.

uct places the insured's work within the products hazard exclusion, then coverage for operations requiring the maintenance or repair of another's product is read right out of the policy. Thus, a narrow interpretation of the meaning of "handled" has the effect of giving meaning to these additional terms in the insurance contract which an expansive reading of "handled" renders nugatory; and it is, of course, a maxim of the law that the courts should prefer a reading of a contract which gives meaning to all the terms thereof. *Masters v. Celina Mutual Ins. Co.*, 209 Pa.Super. 111, 224 A.2d 774 (1966); *Delaware County Constr. Co. v. Safeguard Ins. Co.*, 209 Pa.Super. 502, 228 A.2d 15 (1967). See also Murray on Contracts § 115 (Rev. ed. 1974).

■ Finally, in light of the fact that there are two at least equally reasonable interpretations of the insurance policy, there can be little doubt that the hearing court's analysis requires reading the policy in the light most favorable to Travelers; whereas, it is hornbook law that insurance contracts must be read in favor of the insured, if more than one interpretation is reasonable. Murray on Contracts § 119 (Rev. ed. 1974). See, e. g., *Burne v. Franklin Life Ins. Co.*, 451 Pa. 218, 301 A.2d 799 (1973). Hence, we conclude that the lower court erred in holding that Friestad's installation of the Sears furnace in the Thompson home fell within the products hazard provision of the contract. Under the proper reading of the policy, the furnace installation in this case was a completed operations hazard. Cf. *American Policyholders' Ins. Co. v. McClinton*, 100 N.J.Super. 169, 241 A.2d 462 (1968).

The foregoing discussion does not end our inquiry, however. As was mentioned above, the premises-operation coverage which Friestad clearly purchased carried a computation of the premium in the policy provision entitled "Description of Hazards;" the products hazard was accompanied by the notation "Coverage Excluded;" but, the completed operations hazard was coupled with no entry whatsoever. Friestad argued below that no entry meant coverage was not excluded and fortified this argument by referring to a

provision immediately preceding the Description of Hazards which stated: "Insurance is afforded with respect to each of the hazards designated below unless the statement 'Coverage Excluded' is entered with respect thereto." On this basis Friestad argues that the policy clearly and unambiguously provided coverage for the completed operations hazard despite the lack of a specific premium charge therefor. See *Hagarty v. William Akers, Jr., Co., Inc.*, 342 Pa. 236, 20 A.2d 317 (1941). Indeed, Friestad contends that the explanation for no premium being listed for completed operations lies in the method insurance companies use to compute such premiums: During an audit period following the purchase of the policy, the business receipts of the insured are totalled, and the premium will vary with the amount of business, in thousands of dollars, which the insured does. Because an audit must be conducted, there can be no entry for completed operations coverage at the outset of the insurance period. See *Kansas City Insulation Co. v. American Mut. Liab. Ins. Co.*, 405 F.2d 53 (8th Cir. 1968).

Given this argument at the hearing, Travelers attempted to prove that, following the issuance of the instant policy, its agents computed a premium for the completed operations hazard and products hazard which Friestad rejected as too expensive.[9] Nevertheless, the court barred all reference to premiums, as well as evidence concerning the understanding of the parties, on the basis of the parol evidence rule.[10] We also find this to be error.

**9.** Interestingly, while the completed operations premium is based on business *receipts,* the products hazard premium is based upon *sales,* which further indicates that the products hazard focuses upon the sale of a product, while the completed operations hazard encompasses the provision of a service. See Henderson, 50 Neb.L.R. at 425.

**10.** The court declined to find that the "no entry" clause in the policy which Friestad referred to was ambiguous, despite the fact that it was immediately followed by: "Absence of any entry with respect to any hazard indicates that there is *no exposure* under the hazard on the effective date of the Sections I and II–Declarations [i. e., April 28, 1967.]" [Emphasis added.] Travelers argued that this sentence meant that, on the effective date of the policy, Friestad had no exposure to liability under the completed operations hazard.

The parol evidence rule only applies to written agreements which are integrated. Restatement of Contracts, 2d §§ 235, 236, 239 (1973). As Dean Murray has written in defining the parol evidence rule:

"[I]f the parties to a transaction have embodied that transaction either in whole or in part, in a single memorial, such as a writing or writings, and *if they have come to regard that memorial as the final expression of their intentions as a whole, or a part thereof,* then all other utterances that have taken place in connection with that transaction, prior to or contemporaneous with the making of the memorial, are immaterial for the purpose of determining what the terms of the transaction are or at least so much of it as is embodied in the memorial." Murray on Contracts § 105 at p. 227 (Rev. ed. 1974).

Both parties concede that ordinarily an audit is required following the issuance of a policy to determine the premium for completed operations. Obviously, Friestad would be entitled to reject such coverage if he considered the quoted premium too high, so it is impossible to conclude, with respect to completed operations coverage, that the insurance contract was the "final memorial" of the agreement between Friestad and Travelers. Hence, the parol evidence rule was not applicable and the court erred in employing it to bar the evidence which Travelers sought to introduce in order to clarify the terms of the insurance contract. See also *Rempel v. Nationwide Life Ins. Co.*, 227 Pa.Super. 87, 323 A.2d 193 (1964). That being the case, we cannot now determine whether Friestad obtained or rejected coverage for completed operations, so we must remand for a hearing to receive the evidence necessary for making that determination. See *First Nat'l Bank of Marietta v. Hoffines*, 429 Pa. 109, 239 A.2d 458 (1968); *Paull v. Paull*, 384 Pa. 2, 119 A.2d 93 (1956); *Gothie v. Smyser*, 189 Pa.Super. 170, 149 A.2d 511 (1959).

For the foregoing reasons, the order of the court below is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

192

HESTER, J., dissents.

HOFFMAN, J., did not participate in the consideration or decision of this case.