HARTFORD ACCIDENT & INDEMNITY COMPANY,
APPELLANT, V. JOHN BURMEISTER, DOING BUSINESS AS
NEW STAR SILO COMPANY, ET AL, APPELLEES.
297 N.W.2d 401

Filed October 10, 1980.   No. 42979.

R. M. Dustin for appellant.

Wyman E. Nelson of O'Hanlon & O'Hanlon for appellee Burmeister.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

The appellant insurance carrier, Hartford Accident & Indemnity Company (Hartford), appeals from a judgment of the District Court for Washington County, Nebraska, which found that Hartford was obligated under a policy of insurance issued by Hartford to John Burmeister, doing business as New Star Silo Co. (Burmeister). By its order, the court directed Hartford to pay any sum within the policy limits which Burmeister might be required to pay by reason of a suit filed by Harold McGowan and Shirley McGowan against Burmeister for personal injury sustained by Harold McGowan (McGowan) while constructing a residence on which Burmeister had previously performed some work and to defend that suit. Our review of the record in this case, however, convinces us that the policy in question did not provide coverage and, therefore, we must reverse the action of the trial court.

Some time in 1967 or 1968, Burmeister purchased from Hartford a casualty insurance policy which contained a manufacturers' and contractors' liability coverage addendum. The policy was renewed from time to time, including a renewal for the period from Jan-

uary 1, 1976, to January 1, 1979. The policy is of the type generally referred to as a manufacturers' and contractors' liability policy, 1966 revision form. The policy specifically provides that Hartford will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of either bodily injury or property damage to which the insurance applies. The policy contains certain specific exclusions — among them, a disclaimer of liability for property damage to the named insured's products arising out of such products or any part of such products; an exclusion which applies to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of materials, parts, or equipment furnished in connection therewith; and an exclusion of liability for bodily injury or property damage included within the "completed operations hazard" or the "products hazard."

Under the terms of the policy, an operation is deemed completed at the *earliest* of the following times: "(1) when all operations to be performed by or on behalf of the *named insured* under the contract have been completed, (2) when all operations to be performed by or on behalf of the *named insured* at the site of the operations have been completed, or (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project." (Emphasis in original.) The policy specifically provides that "Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed."

The evidence in the case discloses that on or about March 8, 1977, the McGowans contracted with Burmeister to do some concrete work on a subterranean house which McGowan was constructing. Burmeister,

pursuant to the contract, poured the walls, pillars, and roof. The contract between Burmeister and the McGowans provided that the total contract price was to be paid upon completion of the structure and that the contract did not include complete erection of the structure. There were no written specifications, designs, or blueprints involved in the performance of the contract.

The record reflects that, on March 26, 1977, McGowan paid the full contract price of $3,531.50 to Burmeister. Burmeister testified that the total price was paid "when I got through with it." McGowan maintained that he paid Burmeister because Burmeister needed the money right then and because of a friendship between the two rather than because of completion of the contract.

After Burmeister poured the structure, cracks appeared in the exterior side of the roof concrete. The concrete was tested and the cracks reportedly resulted from the concrete having dried too fast. After some excavation was performed, it was disclosed that the interior of the structure likewise contained certain cracks in the ceiling and at locations at the meeting place of the walls and ceiling that did not join. McGowan retained a contractor to erect interior block walls to support the settling roof. Also, a concrete block face was put on as the fourth side of the structure by a masonry contractor. On June 10th or June 17th, 1977, while McGowan was putting dirt on the roof of the structure, the structure collapsed causing both property damage to the structure and personal injury to McGowan. In the interval, after pouring the structure, Burmeister had returned to the job before excavation under the structure and had applied sealer to cracks on the exterior roof. All of the parties agreed that Burmeister was to return again to fill the gaps between the ceiling and the walls, though the evidence indicates a dispute between Burmeister and McGowan as to whether the filling of those gaps was necessary to complete the contract or to correct defects.

Following his injury, the McGowans filed a petition against Burmeister for damages for the contract sum, and consequential damages for structure expenses and loss of rents, and for personal injury. On June 2, 1978, Hartford filed its petition for declaratory judgment as to its liability with regard to the claim set out in the McGowans' petition. On September 12, 1979, the trial court found that under the terms of the policy, Hartford was not obligated to defend or pay damages with regard to any injury to the property itself. The court's journal entry indicates that the court reached its conclusion because of exclusions (n) and (o) of the policy. Those provisions specifically exclude coverage to "*property damage* to the *named insured's products* arising out of such products or any part of such products" or "to *property damage* to work performed by or on behalf of the *named insured* arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." (Emphasis in original.)

The trial court did, however, conclude and declare that Hartford was obligated to defend and pay damages, if any, in connection with the alleged bodily injury.

In reaching its conclusion, the trial court concluded that exclusion (p), the completed operations exclusion, did not apply if the work was turned over to another contractor or subcontractor engaged in performing operations for the principal as a part of the same project. We think that, in this regard, the trial court misconstrued the provisions of the policy and committed error.

The exclusion of paragraph (p) provides that "This insurance does not apply: . . . (p) to *bodily injury* or *property damage* included within the *completed operations hazard* or the *products hazard.*" (Emphasis in original.) That is to say, if it may be found that the bodily injury or property damage occurred from a completed operation, there is no coverage.

To determine whether or not there is a completed

operation, we are required to turn to the definition in the policy. The policy defines completed operations hazard, in part, as follows: "Operations shall be deemed completed *at the earliest of the following times*: (1) when all operations to be performed by or on behalf of the *named insured* under the contract have been completed, (2) when all operations to be performed by or on behalf of the *named insured* at the site of the operations have been completed, or (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project." (First emphasis supplied; other emphases in original.) As noted earlier, the mere fact that an operation may need further service or maintenance work or require correction, repair, or replacement because of any defect or deficiency, does not preclude the project from being deemed completed if, otherwise, it is completed.

The trial court apparently concluded that, if any one of the three events noted above existed, a completed operation did not exist. The policy, however, clearly provides that an operation is deemed completed, not when all the named events occur, but rather, at the first occurrence of any of the three named events. That is to say, if all the operations to be performed by and on behalf of the named insured under the contract have been completed, either at the insured's place of business or at the site of the operations, the operations shall be deemed completed and the exclusion of paragraph (p) must apply, even though the work is turned over to a contractor or subcontractor on behalf of the principal. Therefore, the only question to be determined here is whether the work to be performed by Burmeister was completed prior to the injury that was incurred by McGowan. We believe that the record compels a finding that the work had been completed and that, therefore, exclusion (p) must apply.

The parties are generally in agreement on most of the facts in this case, though obviously in disagreement as to how they should be viewed. The parties concede that on or about March 8, 1977, the McGowans contracted with Burmeister to do certain concrete work on a subterranean "dugout house" which McGowan was building. There were no written specifications, designs, or blueprints involved in the performance of the contract. The contract simply provided for digging the trenches and for the labor and material in pouring three concrete walls, pillars, and a ceiling on the subterranean home structure, as well as digging a waterline for the structure. The total contract price was to be paid on completion of the structure. Burmeister started the work on March 8, 1977, and completed it on or about March 26, 1977, when McGowan paid him the full contract price of $3,531.50. Burmeister testified that the total price was paid "when I got through with it." McGowan, on the other hand, maintained that he paid Burmeister before the work was completed because Burmeister needed the money and they were friends. There is no evidence to support that view other than McGowan's own assertions.

In the interval between pouring the structure and McGowan's excavation under it, Burmeister had returned to the job and applied sealer to cracks on the exposed exterior roof. Burmeister further testified that when he initially talked to McGowan about the pouring, McGowan told him he did not care about any rough spots or separations between the wall and ceiling because he was going to put a finished ceiling in the house. It was not until the work by Burmeister was done that McGowan said something about the spaces and asked Burmeister to fix them. Burmeister specifically testified that after he had completed the pouring, the only thing that he was going to do in the future after he left the job was to correct the deficiencies. The corrections that were to be made were not in any way structural but were for cosmetic purposes. There can be

little question that the evidence clearly establishes that the work was completed within the definition of "completed operations hazard" when the pouring was finished and payment made. Therefore, coverage was excluded under the specific language of the policy which provided that the insurance did not apply "to *bodily injury* or *property damage* included within the *completed operations hazard* or the *products hazard.*" The fact that it was turned over to someone else is not significant for our purposes; nor do we need to consider the question of whether the principal may also be the contractor. That specific provision has no application if the work has, in fact, been completed as the facts in this case reveal. The clause citing the turning over of the work is applicable only if the work product has not yet been completed but has been put to its intended use. In this case, however, it was completed and, therefore, we need not go further.

We have frequently held that where there is no ambiguity in the language of an insurance policy and the policy specifically excludes completed operations coverage, there is no obligation on the part of the company to defend. See, *Steinheider & Sons, Inc. v. Iowa Kemper Ins. Co.*, 204 Neb. 156, 281 N.W.2d 539 (1979); *Kansas-Nebraska Nat. Gas Co., Inc. v. Hawkeye-Security Ins. Co.*, 195 Neb. 658, 240 N.W.2d 28 (1976). The language of the completed operations hazard is indeed clear and unambiguous. Hartford specifically contracted to be relieved of liability for accidents occurring after completion of the project. The evidence in this case leads to the inescapable conclusion that the work was completed and clearly, therefore, within the exclusion of the policy. The judgment of the trial court, therefore, must be reversed and the cause remanded with directions to enter judgment in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., not voting.