199 N.J. Super. 558 (1984)
489 A.2d 1265
CPS CHEMICAL COMPANY, INC., PLAINTIFF,
v.
THE CONTINENTAL INSURANCE COMPANY AND UNITED STATES FIDELITY AND GUARANTY COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided August 8, 1984.
*561 Michael L. Rodburg for plaintiff (Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, attorneys).
William Gannon for defendant The Continental Insurance Company (Ryan and Gannon, attorneys).
John Peter Duggan for defendant United States Fidelity and Guaranty Company (Wolff, Helies & Duggan, attorneys).
LANDAU, J.S.C.
In this matter CPS Chemical Company, Inc., seeks declaratory judgment for indemnification and defense under a comprehensive general liability policy.
The present motion is for partial summary judgment against each of the insurance carriers to declare their obligation to defend plaintiff in the underlying liability suit entitled City of Philadelphia v. Stepan Chemical Co., et al., 544 F. Supp. 1135 (E.D.Pa. 1982) in which plaintiff is a named defendant. The liability suit, presently pending in the U.S. District Court for the Eastern District of Pennsylvania, arises out of allegations of the City of Philadelphia that CPS and 33 other defendants *562 generated toxic wastes which were illegally deposited in a city garbage dump.
Based on the statement of facts in defendants' proofs, it is not disputed, for the purposes of this motion, that CPS contracted with the ABM Disposal Company to remove and properly dispose of its waste material. Further, for the purposes of this motion we may assume that ABM removed wastes from plaintiff's premises and, without plaintiffs knowledge, later deposited these wastes at the Philadelphia dump on 16 separate occasions. The first such occasion was on October 9, 1974. Thereafter individual dumpings occurred on 15 more occasions ending December 10, 1975. In its suit Philadelphia seeks to hold CPS liable for clean-up costs, consequential damages and penalties, alleging causes of action under:
1.) The "Superfund" Act of 1980, 42 U.S.C.A. §§ 9601-9657.
2.) The "Clean Water" Act, 33 U.S.C.A. 1251.
3.) Common law nuisance, Restatement, Torts 2d, § 821B (1965).
4.) Common law strict liability for ultra-hazardous activities Restatement, Torts 2d (1965).
5.) The Pennsylvania Solid Waste Management Act 35 Pa. Stat. Ann. § 6018.101.
6.) The Pennsylvania "Clean Streams" law 35 Pa. Stat. Ann. § 691.3.
7.) Common law negligence.
8.) City Code of Philadelphia concerning use of city property for dumping. Phil.Code § 10-710.
A count for intentional tort and reckless trespass was originally included but dropped from the city's complaint against CPS. One of the theories of action by the city against CPS is that it negligently selected ABM as its waste disposal agent.
Plaintiff's motion for summary judgment to compel a defense requires that the allegations of the underlying complaint fall within the risks insured. The nature of the claim determines whether the insurer is obliged to defend, after the language of the policy has been explored. Ohio Casualty v. Flanagin, 44 N.J. 504 (1965).
*563 It is not disputed that a comprehensive general liability policy from Continental was in effect between March 2, 1974 and March 2, 1975; and that similar policies issued by United States Fidelity and Guaranty Company (U.S.F. & G) were in effect from March 2, 1975 through March 2, 1977; and that timely request for a defense was made by plaintiff. Plaintiff now conducts its own defense in the City of Philadelphia action.
Defendants deny that the Philadelphia complaint asserts any causes of action which require a defense or indemnification under the comprehensive general liability policies. They rely on exclusionary provisions contained in such policies and deny that an "occurrence" exists under the policy definition. They also dispute whether the policies are applicable to the time which they urge is relevant in determining the existence of an "occurrence."
Mindful that the policies provide that a defense must be rendered for injury or property damage asserted as "to which this insurance applies," each of these objections will be separately analyzed.

I.

Existence of an "Occurrence."
Under each of the policies "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
Concededly, suit has been brought against CPS for damages, based on physical injury to tangible property. None of the remaining counts in the Philadelphia suit assert that CPS intended or expected to cause property damage or expected ABM to illegally deposit the wastes. Nor is it alleged that CPS expected the subsequent release of hazardous waste or intentionally engaged in unlawful acts.
*564 Thus, in determining whether a duty to defend exists, this court is not required to consider knowing and intentional actions of plaintiff other than the pleaded and conceded turnover of its toxic wastes to ABM for removal and disposal.
If the allegations are true, was there an "occurrence" during the applicable policy period covered by the policy?

A.

Existence of an "Accident."
It is now well settled in this and other jurisdictions that the word "accident" as used in an insurance policy connotes an unexpected or unforeseen event. Linden Motors Freight v. Travelers Ins. Co., 40 N.J. 511 (1963). Moreover, as specifically held in our courts, and as provided in the policy definition of "occurrence," the unexpected or unforeseen character of the accident is viewed from the standpoint of the insured. See Lansco Inc. v. Dept. of Environmental Protection. 138 N.J. Super. 275, aff'd 145 N.J. Super. 433 (App.Div. 1976), certif. den. 73 N.J. 57 (1977). Absent contrary allegations by the City of Philadelphia in its complaint, or affidavits tending to show intent or knowledge in opposition to this motion, the court accepts for this motion that the alleged ABM disposal was unexpected and unforeseen by plaintiff and therefore constitutes an accident within the generally accepted definition of that term.

B.

Effect of ABM's Possible "Agent" Status.
Defendant USF & G argues that even if plaintiff did not anticipate the unlawful disposal and resulting injuries, it should be charged as a principal with the knowing conduct of its "agent," ABM. It is unnecessary for this court to now determine *565 whether ABM was an agent rather than an independent contractor. In order to satisfy the accidental aspect, it is sufficient that a person engaged by plaintiff is alleged to have committed acts which were not expected or foreseen by the plaintiff, and that Philadelphia alleges that plaintiff herein is liable by reason of those acts. As between plaintiff and its insurance carrier, and viewed from the standpoint of the insured, the acts were "accidental." As held in Jackson Township v. Hartford Acc. and Indemn. Co., 186 N.J. Super. 156 (Law Div. 1982) coverage "will be provided for the unintended results of an intentional act." Id. at 164.
The issue of respondeat superior may or may not arise in the underlying action, but should bear no place in defining the obligations between the insured and its carriers. This is highlighted by the fact that the city has asserted in one of its counts the negligent selection of ABM by CPS. This court declines to interpret the general liability insurance policy as requiring that an insured be free from negligence in choosing contractors or "agents" as a pre-condition to coverage and provision of a defense under such policy.

C.

Time of "Occurrence."
Defendants further contend that no "occurrence" took place for coverage purposes until the actual discovery of environmental damage some four-to-five years after the wastes had been deposited and after the expiration of defendants' policies. Philadelphia's complaint, however, alleges liability for events which took place before the actual discovery of damages. Count three (nuisance), count eight (negligence), and count nine (Philadelphia code violations) all allege liability for events which commenced with the initial ABM dumpings of CPS' wastes in 1974 and 1975. The term "occurrence" as used in the policies is *566 not limited to connote only the date of discovery of damage. "Occurrence" is an "accident ... which results ... in damage." Time of discovery of the accident does not determine when it took place. The complaint alleges damages commencing with the date of dumpings. For determination of the duty to defend under those policies, it is not necessary now to resolve the factual accuracy of those allegations.[1]

D.

Effect of Plaintiff's Non-Participation in Unlawful Dumping.
Do acts of dumping by ABM constitute "occurrences" for purposes of CPS' insurance coverage?
Putting aside for the moment the "completed operations hazard" and "products hazard" exclusions asserted by the defendants, it is not necessary to go beyond the allegations of the underlying complaint on this issue either. Correctly or incorrectly, the complaint says that CPS is liable under the several theories asserted, even after turning the wastes over to ABM. Assuming that these events took place while the wastes were in the control of ABM, there is nothing in the definition of occurrence which limits "occurrences" to events or actions over *567 which the insured has control. The intentional acts of a third party may result in liability for damages which were unforeseen, unexpected, and unintended by the insured. Such liability may be considered the result of an accidental "occurrence," from the insured's standpoint, and thus not excluded from insurance coverage, Lansco v. Dept. of Environmental Protection, supra. Plaintiff is being charged with the liability and so must be defended against the allegations.

II.

The Completed Operations Hazard Exclusion
Both defendants contend in their opposition papers that coverage is modified by the "completed operations hazard" exclusion and the "products hazard" exclusion contained in a policy endorsement.[2] Defendants maintain that CPS completed its operations regarding the wastes when it turned them over to ABM for disposal.
Completed operations coverage generally provides the same protection to construction and service companies that products liability coverage provides to companies dealing in goods; that is, protection against liability stemming from the services, materials, or structures which the insured introduces to the marketplace.
Commentators are in complete agreement that this exclusion refers to accidents caused by defective workmanship which arise after completion of work by the insured on construction or service contracts. See, e.g. 58 A.L.R.3d § 2(a).
The present matter does not involve construction or service operations of plaintiff. Coverage is not precluded by the completed operations hazard exclusion.

*568 III

The Products Hazard Exclusion
Similarly, the "products hazard" exclusion is inapplicable to this type of pollution case. The majority of courts define "products" as the goods or services which the insured deals in as his stock-in-trade. Steyer v. Westvaco Corp. 450 F. Supp. 384 (D.Maryland 1978). Industrial wastes not intended for consumption, sale, or use by others are not "products" in the view of this court, nor would a reading of the policy reasonably indicate that they were so intended by the parties.

IV

The Pollution Exclusion
Each of the policies excludes coverage for:
bodily injury or property damage arising out of the discharge, dispersal, release or escape of ... waste materials ... into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
The carriers contend that this clause furnishes a clear cut exclusion to coverage, and that it was obviously so intended. While the argument has a superficial attraction, the language of the clause has received much judicial construction. As interpreted in New Jersey and other jurisdictions the clause serves a limited exclusionary function, which does not reach the allegations of the Philadelphia case.
Undoubtedly, the nature of the materials is that contemplated by the exclusion, i.e., toxic pollutants discharged or escaping into or upon land or a body of water. However, the exclusion does not apply if the discharge or release is "sudden and accidental."
The court has already held that the term "accident" is broad enough to encompass the unexpected and unintended actions of *569 ABM and their consequences. A similar question is presented by its use in the pollution exclusion clause. As held in Jackson Township, supra, "the clause can be interpreted as simply a restatement of the definition of `occurrence'  that is, that the policy will cover claims where the injury was `neither expected nor intended.' It is a reaffirmation of the principle that coverage will not be provided for intended results of intentional acts but will be provided for the unintended results of an intentional act." 186 N.J. Super. at 164. Moreover, Lansco v. Dept. of Environmental Protection, supra, sets out the following definition of "sudden": "`sudden' means happening without previous notice or on very brief notice; unforeseen; unexpected; unprepared for." 138 N.J. Super. at 282.
It is well recognized that ambiguities in insurance policies are resolved against the carriers which drafted them. Here, the words "sudden" and "accidental" have been interpreted by recognized dictionary definitions to include unexpected and unintended events. It may well be that the drafters of this clause believed that "sudden and accidental" connoted a sense of a dramatic catastrophe, limited in duration and immediate in its consequences, but it cannot fairly be said that this was unambiguously expressed. Comprehensive general liability policies, of this vintage, have been recognized to be "poorly drafted" by insurance commentators. See, e.g., Obremski, supra at 33.
The Court must render summary judgment where "the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact." Judson v. Peoples Bank & Trust Co. of Westfield 17 N.J. 67, 74 (1954). For the reasons above expressed, partial summary judgment will be entered in favor of plaintiff and against defendants on the issue of duty to defend.
Submit an appropriate order.

*570 APPENDIX
The Completed Operations Hazard
"Completed Operation Hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(1) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed.
(2) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or
(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.
Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, which are otherwise complete, shall be deemed completed.
The Completed Operations Hazard does not include bodily injury or property damage arising out of:
(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b) The existence of tools, uninstalled equipment or abandoned or unused materials, or
(c) operations for which the classification stated in the policy or in the Company's manual specifies "including completed operations" ...
The Products Hazard
"Named Insured's Products" means goods or products manufactured, sold, handled or distributed by the Named Insured or by others trading under his name, including any container thereof (other than a vehicle), but "Named Insured's products" shall not include a vending machine or any property other than such contained, rented to or located for use of other but not sold.
"Products Hazard" includes bodily injury or property damage arising out of the Named Insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the Named Insured and after physical possession of products has been relinquished to others.
NOTES
[1] The court recognizes the considerable controversy respecting the date when duty to indemnify is triggered when long periods of time pass between the initial accident or exposure, manifestation, and ultimate or long-continued damages. These and similar issues, previously recognized by commentators and courts, do not affect the duty to defend which is here determined. See, e.g., Obremski, "Toxic Tort and the Insurance Coverage Controversy," 34 Federation of Insurance Counsel Quarterly 3,32. And see Jackson Township, supra, 186 N.J. Super. at 165 ("The question of which carrier must indemnify for the occurrence or occurrences of pollution is a separate and perplexing issue ... this court [has] held that the carriers owed ... a duty to defend, but that the question of indemnification should await the outcome of the main suit.")
[2] See Appendix at 570.