248 N.J. Super. 105 (1991)
590 A.2d 262
UNITED STATES FIDELITY AND GUARANTY COMPANY, PLAINTIFF,
v.
GREATER ESSEX SECURITY, INC., DEFENDANT.
ROVAL LUMBER AND MILLWORK COMPANY, PLAINTIFF,
v.
GREATER ESSEX SECURITY, INC., DEFENDANT.
THOMAS MALLEY, BERNICE MALLEY AND CHESTER SZYMANSKI, PLAINTIFFS,
v.
JOHN DOES I THROUGH VI (A FICTITIOUS NAME), ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided March 21, 1991.
*106 Anthony R. Mautone for plaintiff (Sara A. Friedman of counsel).
Philip M. Lustbader for defendant Greater Essex Security, Inc.
YANOFF, J.S.C. (retired and temporarily assigned on recall).
In a sense, this is a continuation of the issues raised by West v. MacDonald, et al., 103 N.J. Super. 201, 247 A.2d 20 (App.Div. 1967), aff'd 52 N.J. 536, 247 A.2d 129 (1968), of which more later. Two issues have been raised: the first, whether the "completed operations hazard" provision of defendant's insurance policy bars recovery under the facts in this case; the second, whether the carrier is equitably estopped from disclaiming coverage by reason of having assumed, under a "non-waiver" agreement, defense of the case. This need not be answered because I have concluded that there is coverage.
This litigation arose out of a fire on June 19, 1988 at Roval Lumber & Millwork Company ("Roval"). After a number of claims had been consolidated, I ordered the action of United States Fidelity & Guaranty Company ("USF & G"), for a declaratory judgment that its insurance policy for the policy period September 24, 1987 to September 24, 1988 did not cover the loss, to be tried separately. The case was tried without a jury.
The facts are not complex. Greater Essex Security, Inc. ("Essex") has, since approximately June 1980, serviced Roval's fire alarm system under an oral agreement. Essex consists of Gary Cocchia, who is an expert in the installation and servicing of such systems. The system involved is a fire alarm system which he did not install and which is connected by a Gamewall Masterbox to the fire department of Belleville. Under the agreement, Essex came monthly to test the fire alarm system and charged, during the applicable period, $30 each month. *107 The agreement required Essex to be on call for emergencies, 24 hours a day. If something was wrong with the system, Essex repaired it and, where the repair was significant, rendered an extra bill. Essex also submitted with the bill, a report stating what had been done to the system.
Essex' last inspection before the fire occurred on June 8, 1988. Its June 8 report showed everything in order except "one pneumatic fire circuit 28C-NT." According to Cocchia, "NT" means that the circuit was not working.
Cocchia did not repair the circuit on June 8 because he needed specialized equipment which he did not have with him. He planned to come back another time to make the repair. Cocchia stated that this was part of his maintenance contract and I find, as a fact, that this is so. The fire on June 19 did not involve the portion of the lumber yard protected by the defective circuit. On the date of the fire, Cocchia was called by the Belleville Fire Department early in the morning and got to the scene approximately 40 minutes later.
Access to the Gamewall Masterbox can be had only by opening a lock. Only Cocchia and the Belleville Fire Department had keys to the lock.
Cocchia testified that when he tested the Roval fire alarm system on June 8, he shut off the connection to the Belleville Fire Department in the Gamewall Masterbox. This he did by disengaging a triparm. He stated that, after the June 8 inspection, he replaced the triparm so that the connection to the Belleville Fire Department was functioning. However, when he examined the Gamewall Masterbox the day of the fire, he found that the triparm had been completely pulled out of the mechanism which meant that connection to the Belleville Fire Department was not functioning. Cocchia was certain that when he left the box on June 8, it had been locked.
Although Cocchia's report of June 8 states that the system was left in service, it is a fact that the area serviced by No. *108 28C  not involved in the fire  was not covered. Essex' relationship with USF & G went back to at least 1985.
Eleanor Milano testified on behalf of USF & G. At all pertinent times and presently, she was and is the employee of RLM Agency, Inc., which actually wrote the policy. She testified that, as a matter of routine, she spoke to Cocchia on the telephone and offered him "completed operations" coverage which he refused. This, Cocchia denied, stating instead that he told the agency the nature of his business and accepted the agency's recommendation as to the form of insurance.
The policy is entitled "Comprehensive General Liability Insurance." On the cover page, the business of the insured is stated as "Security System Installation." However, in the "coverage part" of the policy, under the heading "premises/operations" is stated "electrical apparatus/installation, servicing or repair," followed by No. 17313. On the same line is stated the premium base, the rates, and the premiums for both bodily injury and property damage. Milano stated that this description of Essex' business controlled the premium.
I have concluded that it does not matter whether Milano offered Cocchia the broader coverage and Cocchia refused. The policy provides:
"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Named Insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(1) when all operations to be performed by or on behalf of the Named Insured under the contract have been completed,
(2) when all operations to be performed by or on behalf of the Named Insured at the site of the operations have been completed, or
(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

*109 Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.
The completed operations hazard does not include bodily injury or property damage arising out of:
(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or
(c) operations for which the classification stated in the policy or in the Company's manual specifies "including completed operations"....
The USF & G policy also contains the following exclusion:
It is agreed that such insurance as is afforded by the Bodily Injury Liability Coverage and the Property Damage Liability Coverage and, if a Contractual Liability Insurance (Designated Contracts Only) Coverage Part forms a part of the policy, such insurance as is afforded by such Coverage Part for Contractual Bodily Injury Liability and Contractual Property Damage Liability, does not apply to bodily injury or property damage included within the Completed Operations Hazard or the Products Hazard.
USF & G contends that the further service or maintenance work provision quoted above bars recovery even though one of the circuits had not been repaired. USF & G argues also that paragraph (3) controls since the property had been put to its intended use following the service performed by Essex.
If West v. MacDonald, supra, controls, the issue of whether the operation was completed is factual, and I need go no further than to decide the facts. MacDonald agreed to service the West's swimming pool on a regular basis, opening it in the spring, and closing it in the fall. At the owner's request, MacDonald lowered the water in the pool. The men who were sent to do that found that the pool was "in pretty bad shape" and proceeded to empty the pool and clean it in accordance with the usual spring practice  this, in 1964. They then partially filled the pool with water. About a month later, the owner informed MacDonald that the pool had risen out of the ground, claiming that this was caused by insufficient filling of the pool. When MacDonald was sued for negligence, the carrier invoked a "completed operations" provision.
*110 The "completed operations" provision of the policy in that case differs from that in the case at bar, and reads:
(2) operations, including any act or omission in connection with operations performed by or on behalf of the named insured on the premises or elsewhere and whether or not goods or products are involved in such operations, if the accident occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the named insured; provided operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; * * * [103 N.J. Super. at 207, 247 A.2d 20]
The trial court held that there was no coverage as a matter of law. Judge Conford, for the majority, stated:
It is true that there was no dispute of fact as to the operative circumstances related by MacDonald concerning the arrangements for the doing of the work with West and as to what was done and what remained to be done. But disputable conclusory inferences sometimes fall into the category of disputed fact for purposes of allocation to the jury rather than the judge (e.g. negligence), and we are clear that this is so in relation to an issue of completion of a contracted operation. See, generally, Thayer, "`Law and Fact' in Jury Trials," 4 Harv.L.Rev. 147, 151-152; cf. Bass v. Allstate Ins. Co., 77 N.J. Super. 491, 495 [187 A.2d 28] (App.Div. 1962). We think reasonable men could differ here as to whether this job was completed or not, even in the light of the policy proviso that "operations shall not be deemed incomplete because * * * further operations may be required pursuant to an agreement." That language is somewhat ambiguous. Almost every ongoing contract operation may be said to involve a situation where further "operations" are required by the agreement. An overliteral reading of the clause could render it destructive of the coverage as to some indisputably incomplete operations. It seems to us that the clause means only that the mere fact that further operations may be required does not necessarily stamp the operation as a whole as incomplete.... [Id. at 211, 247 A.2d 20]
There was therefore a reason for factual determination "whether the West contract operation was completed...." Id. at 214, 247 A.2d 20.
Judge Foley, in dissent, viewed the work which had been done as discrete from the servicing contract, saying:
True, it may have been the contemplation of the parties that MacDonald would return at a later time, upon West's request, to ready the swimming pool for summer use involving additional work ... But any such work would be unrelated to and distinctly from, and readily severable from, the job of lowering the level of the pool, which was the "operation" for which the parties contracted. [Id. at 214-215, 247 A.2d 20 (Foley, J.A.D., dissenting in part)]
*111 At oral argument in the case at bar, it was contended on behalf of the carrier that the policy covered only work negligently performed while the assured was on the premises, but that after the assured had departed the premises, the completed operations provision barred recovery.
The major allegation of negligence against Essex in other aspects of the consolidated litigation is that Cocchia failed to set the triparm in the box connecting it to the Belleville Fire Department. If that is so, the fire alarm system could not have been put to its "intended use" until the situation had been rectified. Whether this is so is obviously a factual issue. If the fact is that the system was entirely non-functional when Cocchia left on June 8, there was not a "completed operation."
It is not appropriate to decide whether Cocchia restored the triparm before he left on June 8 because my ruling might constitute collateral estoppel in the litigation between Roval and Essex. The record is inadequate and the issues have not been explored. It is not known when and how the fire department received the alarm. It is conceivable that expert testimony may have a bearing on the problem. See United Rental Equip. Co. v. Aetna Life & Cas. Ins. Co., 74 N.J. 92, 101, 376 A.2d 1183 (1977). If the fact is, as claimed by Cocchia, that only "one pneumatic fire circuit 28C" was inoperable, the issue is not easily resolved.
In view of the policy provision that "operations which may require further service or maintenance work  because of any defect or deficiency, which are otherwise complete, shall be completed" it becomes a factual question whether a failure to repair one circuit not germane to the fire, and which Cocchia did not consider important enough to repair promptly, bars application of the completed operations provision. I do not rule on that issue because I conclude that, as a matter of law, the type of service performed by Essex is such that the completed hazard exception is not applicable, and that therefore, there is coverage.
*112 Determination of this issue requires consideration of the history of this type of insurance coverage. In Friestad v. Travelers Indem. Co., 260 Pa.Super. 178, 393 A.2d 1212 (1978), the court discussed changes in insurance policies which resulted from the expansion of products liability. The court noted:
... As the businessman's risk of liability for defective products and workmanship grew, so did his need for insurance coverage for such potential liability. Id. Since then, the development of the law of products liability insurance has witnessed the insurance companies' efforts to draft its comprehensive business owners insurance policies, first, to provide such liability coverage for those who wished to purchase it, and second, to segregate the hazards, and consequently the premiums charged therefor, which arose from either the manufacture, sale, handling or use of a product per se, [i.e., the products hazard] as opposed to the hazard which arose principally from the performance of a service [i.e., the completed operations hazard]. [393 A.2d at 1214]
The facts in Friestad were that Friestad installed a furnace in the home of a customer of Sears Roebuck and Company pursuant to a Friestad contract with Sears. Apparently, the installation was defective in some respect because a fire occurred thereafter. The trial court granted summary judgment in favor of the insurance carrier. The appellate court reversed for two reasons: 1) its conclusion that there was a factual issue as to whether Friestad had, indeed, purchased completed operations coverage; and 2) because the court had excluded oral evidence as to the premiums to be paid. I conclude from this that, despite the quoted language, the Friestad court did not decide as a matter of law whether the installation of a furnace could, by possibility, come within the completed operations provisions of the insurance coverage.
The problem involved here has not been decided in New Jersey. West, supra, does not reflect the drafting changes which Friestad discusses, and which appear in the policy sub judice.
Other New Jersey decisions do not involve the service contract situation. In McAllister v. Century Indemnity Co., 24 N.J. Super. 289, 94 A.2d 345 (App.Div. 1953), aff'd 12 N.J. 395, 97 A.2d 160 (1953), the completed operations defense was raised *113 in the context of a case in which the insured installed an oil tank under a sidewalk and was subsequently sued for something which occurred after the installation had been completed. Construing the policy against the insurance carrier in accordance with the standard rule, the Appellate Division concluded:
... Except as particular provisions of the policy so curtail its scope that an ordinarily intelligent man would understand that the policy does not cover certain risks which come within its general scope  with that exception, the policy should be construed to cover all liability for accidents arising from plaintiff's operations, whether the accidents happened before or after the excavation job was finished. [24 N.J. Super. at 294, 94 A.2d 345]
McAllister was distinguished in American Policyholders' Ins. Co. v. McClinton, 100 N.J. Super. 169, 241 A.2d 462 (Ch. Div. 1968) where the insured changed a thermostat on a boiler previously installed. The boiler subsequently exploded. The court held that on a fair reading of the policy, coverage was barred by the completed operations provision. However, quite obviously, this was not a service contract case, as is the case at bar.
In C.P.S. Chem. Co., Inc. v. Continental Insurance Co., 199 N.J. Super. 558, 489 A.2d 1265 (Law Div. 1984), reversed on non-coverage ground 203 N.J. Super. 15, 495 A.2d 886 (App.Div. 1985), C.P.S. was under a contract with A.B.M. Disposal Company to remove and properly dispose of its waste material. Apparently, it did so on more than 15 occasions. The completed operations provisions of the policy were almost identical with those involved here. The issue was whether the carrier had an obligation to defend a suit alleging illegal deposit of toxic wastes in a city garage dump. Judge Landau held that the completed operations provisions did not bar the obligation of the carrier to defend, writing:
Completed operations coverage generally provides the same protection to construction and service companies that products liability coverage provides to companies dealing in goods; that is, protection against liability stemming from the services, materials, or structures which the insured introduces to the marketplace.
Commentators are in complete agreement that this exclusion refers to accidents caused by defective workmanship which arise after completion of work by the insured on construction or service contracts. See, e.g. 58 A.L.R.3d § 2(a). [199 N.J. Super. at 567, 489 A.2d 1265]
*114 Whether this was in a generic sense, a service contract, or a series of discrete services was not determined. It does, however, tend to support the conclusion reached in this decision.
None of the cases cited on behalf of the carrier involves a service contract. I analyze only a few by way of example. In Lavalleur v. State Auto and Cas. Underwriters, 208 Neb. 82, 302 N.W.2d 362 (Sup.Ct. 1981), repair of a cylinder of a backhoe on the job site was involved. In Hartford Acc. & Indem. Co. v. Burmeister, 207 Neb. 206, 297 N.W.2d 401 (Sup.Ct. 1980), a mason worked on a subterranean house and left the job. Although he was to return later to perform additional work, this was a discrete factor similar to that found by Judge Foley in West, supra. Dabbs v. Cincinnati Ins. Co., 293 S.C. 234, 359 S.E.2d 521 (Ct.App. 1987) involved the installation of a heating and air conditioning system, followed by service calls. However, the service calls were auxiliary to a major installation.
Friestad cited, as does Judge Landau, Annotation, "Liability Insurance  `Completed Operations'," 58 A.L.R.3d 12 (1974), which deals extensively with the problem. There, the author states:
The following cases support the view that a provision excluding liability for loss or injury arising after operations of the insured have been completed or abandoned on premises not owned or controlled by the insured does not apply to claims arising from the performance by the insured of services only, or where the sale, handling, or manufacture of products is merely incidental to the performance of such services, at least where reference in the policy to the completed operations hazard appears under a general heading referring to products, such as, ... [Id. at 28]
The annotation continues:
In a number of cases involving the question of when operations would be deemed completed within the meaning of the completed operations exclusion of a liability policy, it has been held that a particular act would not be deemed to complete an operation where the insured was under a continuing duty to inspect, maintain, or repair various products or premises. [Id. at 38]
New York law makes the distinction as to service contracts which I consider controlling. Vito v. General Mut. Ins. Co., 15 A.D.2d 289, 223 N.Y.S.2d 431 (App.Div. 1962), leave to appeal denied 11 N.Y.2d 645, 228 N.Y.S.2d 1026, 182 N.E.2d 620 *115 (Ct.App. 1962) is a service contract case. Insured was required to keep a customer's propane gas tanks full. It failed to do so with a resulting explosion. The court held that the completed operations provision did not bar recovery. Accord Lumberman's Mutual Casualty Co. v. Poundridge, 362 F.2d 430 (2 Cir.1966).
Basic principles in the construction of contracts of insurance are set forth in Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 170 A.2d 800 (1961) and Bowler v. Fidelity & Casualty Co. of N.Y., 53 N.J. 313, 250 A.2d 580 (1969). The language quoted from McAllister v. Century Indemnity Co., supra, that a policy is construed as a reasonably intelligent person would understand it, is also pertinent. These tenets of construction have become so well established that quotation is hardly necessary. In Bowler, Justice Francis said, for the Court, "It is fundamental, of course, that courts will interpret insurance policy language liberally in favor of the insured. Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7 [170 A.2d 800] (1961)...." 53 N.J. at 321, 250 A.2d 580. Mazzilli adds also, "But, if the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied." 35 N.J. at 8, 170 A.2d 800. Additionally, "The fundamental principle of insurance law is to fulfill the objectively reasonable expectations of the parties." See Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30, 35, 548 A.2d 188 (1988). If the construction sought by the carrier as indicated at oral argument  that the policy applies only for work negligently done while the assured is on the premises, but that after the assured has departed the premises, there can be no liability, were adopted, it might well be that in a service contract where the work is continual and repeated, coverage would be almost nil. This policy clearly shows that Essex expected to be covered for "electrical apparatus/installation, servicing or repair," and that a premium was fixed for that risk. It would be violating the quoted established principles if coverage were denied.
*116 Counsel for Essex should submit an order pursuant to the rules.