Suzanne BOMBAR, Intervenor,

Upright Materials Handling,
Inc., Appellees

v.

The WEST AMERICAN INSURANCE
COMPANY and First Insurance
Center, Inc.,

Appeal of the West American
Insurance Company,
Appellants.

Superior Court of Pennsylvania.

Argued March 15, 2007.
Filed July 26, 2007.
Reargument Denied Oct. 1, 2007.

Richard L. McMonigle, Jr., Philadelphia, for appellant.

Paul A. Barrett, Scranton, for First Ins., appellee.

Robert W. Munley, Scranton, for Upright, appellee.

BEFORE: STEVENS, KLEIN, and McCAFFERY, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the order entered in the Court of Common Pleas of Lackawanna County granting summary judgment in favor of Suzanne Bombar, Upright Materials Handling, Inc. (Upright), and First Insurance Center, Inc. (First Insurance Center) and against Appellant West American Insurance Company (West American)[1] in an amount totaling $12,008,854.54. On appeal, West American contends (1) the trial court erred in interpreting the commercial insurance contract as covering the bodily injury sustained by Ms. Bombar; (2) the trial court erred in denying West American's motion for summary judgment on the issue of bad faith; (3) the trial court erred in granting Ms. Bombar's motion for summary judgment on the issue of bad faith; (4) the trial court erred in granting First Insurance

---

**1.** Initially, the present action was filed against the Ohio Casualty Insurance Company. However, once it was determined that West American was a subsidiary of Ohio Casualty Insurance Company, the caption was amended to reflect West American as the proper party.

Center's motion for summary judgment and dismissing West American's cross-claim for contribution and/or indemnity; (5) the trial court awarded damages which were excessive, unfounded, and miscalculated; and (6) West American's appeal was timely and from a final order.[2] We affirm.

¶ 2 The relevant facts and procedural history are as follows:

On March 15, 1995, Suzanne Bombar, an employee of Lord Label, Inc., [hereinafter Lord Label] located in Dunmore, Pennsylvania, was struck and severely injured by a forklift while at work. [Ms.] Bombar sustained extensive injuries to her right leg which eventually led to amputation. At the time of the accident, the forklift, which struck [Ms. Bombar], was operated by another employee of Lord Label who drove it in reverse through a plastic curtained opening that obstructed the operator's view.

The forklift was manufactured by Linde, Inc., a German Company, and shipped to Baker, Inc., a subsidiary of Linde, Inc. Baker, who in turn, sold the forklift to Upright ..., in Avoca, Pennsylvania. Upright is in the business of selling such industrial equipment and servicing the same. Lord Label purchased the forklift used the day of the accident from Upright without a backup alarm or strobe light which engages when the forklift is driven in reverse. The forklift was shipped from the manufacturer to Upright without a manufacturer's backup alarm installed.

The forklift was later equipped with an after-market backup alarm by an employee of Upright upon Lord Label's request. Due to the annoyance of the alarm's sound, the evidence indicated that the alarm was intentionally disconnected by Lord Label employees on several occasions including the date on which the accident occurred. There was also evidence that the wiring got caught on structures at Lord Label causing it to disconnect as well. The alarm and strobe light were both battery powered. The manner in which the alarm was installed allowed the wires to be exposed on the outside of the forklift nine frame near the roll-bar. Upright's agent simply mounted the alarm by wrapping the wires around the outside of the roll bar rather than passing the wire through the center of the roll bar as intended by the manufacturer. Upright had been called several times to reinstall the alarm before the accident occurred. There was a factual dispute as to whether the alarm wires were intentionally disconnected or whether they caught and were pulled off during normal operations due to the wires' exterior mounting.

In March of 1994, Upright purchased an insurance policy from First Insurance Center, an agency who used Ohio Casualty Insurance Company [hereinafter Ohio Casualty], as an underwriter. The insuring Agreements states it will pay damages that the insured may be legally obligated to pay because of "bodily injury" or property damage in which the policy applies. (See Commercial General Liability Coverage Form, p. 1). Furthermore, the insurer will hold the right to defend the insured against any "suit" seeking such damages under the application of the insurance policy. (See

---

**2.** While the foregoing is an accurate summary of the issues presented in West American's one-page "Statement of the Questions Involved," we note that, in the argument portion of its brief, West American presented numerous sub-issues with regard to the majority of its general issues. The result is that this Court was required to review an overwhelming number of issues.

Commercial General Liability Coverage Form, p. 1). Yet, the insurer will not pay sums that the insured may be obligated to pay or defend suits that encompass a matter to which the insurance policy does not apply. (See Commercial General Liability Coverage Form, p. 1). Additionally, under the business owner's section of the policy lays a specific Endorsement No. CG 21041185 labeled "Exclusion–Products–Completed Operations Hazard" exception, whereby the insurer will not cover the insured for "bodily injury" or "property damage" which occurs away from the premises the insured owns or rents and arises out of "your product" or "your work." (See Commercial General Liability Coverage Form, p. 5).

After the accident involving the forklift truck, the principals of Upright, Patrick Conflitti and Arthur Watkins, met with Matt Alferio, the owner of First Insurance Center, and notified him of the accident. During that meeting, Mr. Alferio told Mr. Conflitti and Mr. Watkins that no insurance coverage was available. At that time, First Insurance Center did not notify its underwriter, Ohio Casualty ... of the accident Upright had reported involving the forklift truck. Subsequently, Upright purchased "products competed hazard coverage."

On May 24, 1996, Suzanne Bombar filed a complaint against both Baker, Inc. and Upright including claims in strict liability and negligence. Upon service of process, Upright took the complaint to its attorney, Ralph P. Carey, Esquire, who entered a defense. In April 1999, during discovery proceedings, a request was made upon Upright to produce a copy of its insurance policy and in turn, Upright referred the request to First Insurance [Center]. First Insurance [Center] denied cover-

age due to the "Products and Completed Operations Exclusion" by a letter sent to Upright.

In June 1999, Bombar sent a copy of the Complaint to Ohio Casualty who later notified [Ms. Bombar], by letter dated June 30, 1999, that there was no coverage due to the exclusion. This letter was never sent to the insured.

Deposition testimony indicates that Ohio Casualty ... was fully aware of the accusations made against the insured upon receipt of Bombar's Complaint but throughout the entire proceedings the insurance agents' attempts to investigate the claim were only cursory, at best. The local claims manager conceded that he made the decision to inform [Ms. Bombar's] counsel that there would be no coverage provided to Upright due to the exclusion. (See Plaintiff's Exhibit D., D.T. Culotta). Mr. Klatt, the local adjuster, was given instructions by the local manager to obtain statements from the owners of Upright by contacting its counsel, Ralph Carey, Esquire. Apparently, Klatt only scheduled a meeting and retained statements from one of the insured. Klatt remained the adjuster for four months, and then reassigned. The matter was next referred to Don Osbourne. Mr. Osbourne made several attempts to schedule a meeting with the owners of Upright by mail; three of these letters were misaddressed. Osbourne contacted the Law Offices of Ralph Carey on a monthly basis by phone. During one of these phone conversations, Mr. Osbourne was informed that mediation was in progress and that the matter most likely was going to trial. Yet, Ohio [Casualty] never issued a Reservation of Rights letter to Upright during this time, nor did it notify Upright that its coverage was denied in writing, or enter a defense. It has been noted

that neither Upright nor its counsel ever made written demands for a defense on Ohio [Casualty] in the instant suit.

On January 19, 2001, a jury returned a verdict against Upright in negligence for $1,800,000.00. Upright appealed the action to the Superior Court of Pennsylvania, which was later abandoned upon [Ms. Bombar's] motion to mold the verdict to include delay damages. The verdict was ultimately molded to $2,393,458.65.

On March [12], 2001, Upright filed the present Declaratory Judgment Action claiming that Ohio Casualty should have defended it during the course of the initial action and that Ohio [Casualty] should indemnify it for the verdict, and pay damages for alleged bad faith in handling the claim. [The insurance policy at issue was sold to Upright by First Insurance Center as agents for Ohio Casualty]. Original plaintiff, Suzanne Bombar, filed a Petition to Intervene as the real Party in interest, [and her petition] was granted by Order [entered] on April 29, 2002. The Intervenor Complaint was filed [on] May 24, 2002, [in which Ms. Bombar argued Upright was covered by the commercial liability policy at issue.]. On October 18, 2002, Suzanne Bombar was assigned all rights that Upright may have under its policy of liability insurance by Ohio Casualty. Trial Court Opinion filed 1/19/05 at 1–5. *See* Trial Court Opinion filed 12/30/05 at 3–9 (additional discussion of the facts and procedural history).

¶ 3 On February 21, 2002, First Insurance Center filed a motion for summary judgment as to Upright's complaint for declaratory judgment. Therein, First Insurance Center alleged, *inter alia,* that despite its agent's recommendation, Upright did not purchase the products and completed operations coverage, which would have created a duty to defend and indemnify, because such was too expensive. First Insurance Center argued that, since it recommended the appropriate coverage in this case, that being the products and completed operations coverage, and such was specifically refused by Upright's president and treasurer (Mr. Conflitti and Mr. Watkins), First Insurance Center had no duty to defend or indemnify.

¶ 4 On April 8, 2004, Ms. Bombar filed a motion for summary judgment against Ohio Casualty alleging (1) the products and completed operations hazard exclusion is inapplicable to the instant accident, (2) the insurer breached its duty to defend Upright, (3) the insureds cooperated with the insurer in handling the claim and the insurer suffered no prejudice from any late notice of the claim, and (4) the insurer acted with bad faith. On April 8, 2004, Ms. Bombar filed a motion for summary judgment against First Insurance Center alleging, *inter alia,* that Mr. Alferio, who was First Insurance Center's agent, breached a fiduciary duty, which was owed to Upright, when he failed to properly describe the scope and nature of the insurance coverage purchased by Upright. Ms. Bombar alleged that Upright's rejection of the products and completed operations coverage was due to Mr. Alferio's faulty and incomplete explanation of the available coverages and Mr. Alferio breached his fiduciary duty in failing to timely notify Ohio Casualty of Upright's insurance claims.

¶ 5 On April 12, 2004, Ohio Casualty filed a motion for summary judgment alleging that the insurance policy did not cover the accident at issue, it was untimely notified of the accident, and it did not act in bad faith.

¶ 6 On May 14, 2004, the matter proceeded to oral argument, during which Ms. Bombar withdrew any and all claims, in-

cluding her motion for summary judgment, as it related to First Insurance Center. N.T. 5/14/04 at 3–8.

¶ 7 On January 19, 2005, the trial court filed an order granting Ms. Bombar's motion for summary judgment as to Ohio Casualty. Specifically, the trial court concluded (1) the insurance policy at issue covers the underlying accident involving Ms. Bombar, (2) Ohio Casualty is liable for the entire amount of the jury's verdict in the underlying action, including interest at the rate of 3% above the prime rate of interest from the date the claim was made, (3) the court awarded punitive damages against Ohio Casualty with attorney's fees and costs, and (4) the court awarded compensatory damages to the insured, Upright. The order provided that damages, fees, and costs would be decided at a future hearing. The trial court also denied Ohio Casualty's motion for summary judgment.

¶ 8 On February 7, 2005, First Insurance Center filed a second motion for summary judgment alleging, *inter alia,* that, in its answer with new matter to the original declaratory complaint, Ohio Casualty included a cross-claim against First Insurance Center. First Insurance Center averred that it was liable for neither the compensatory nor punitive damages assessed against Ohio Casualty, and therefore, First Insurance Center sought summary judgment as it related to Ohio Casualty's cross-claim.[3] On March 16, 2005, the parties filed a stipulation indicating that West American was being incorrectly referred to as Ohio Casualty, and the caption was amended accordingly.

¶ 9 The matter proceeded to a hearing on June 15, 2005, following which the trial court filed an opinion and order on December 30, 2005, indicating (1) First Insurance Center's motion for summary judgment is granted, (2) West American's motion for summary judgment is denied[4] and West American is liable to Ms. Bombar for the entire jury verdict and delay damages totaling $2,393,458.65, plus interest of $1,513,260.00, (3) West American is liable for punitive damages in an amount of four times the compensatory damages awarded by the jury's verdict, equaling $7,200,000.00, (4) West American is liable to Upright for compensatory damages in the amount of $700,000.00, (5) West American is liable to Upright for attorney's fees and costs totaling $91,212.50, and (6) West American is liable to Ms. Bombar for attorney's fees and costs for prosecution of a bad faith claim in the amount of $110,923.39. The total verdict rendered by the trial court in its December 30, 2005 order totaled $12,008,854.54 against West American.

¶ 10 On January 9, 2006, West American filed a post-trial motion, and Ms. Bombar filed a response indicating that post-trial motions were not appropriate as it related to the summary judgment proceedings. On January 30, 2006, West American filed a notice of appeal to this Court, which was docketed at 224 MDA 2006.

¶ 11 The trial court subsequently filed an order and amended order denying West American's post-trial motion and specifically indicating judgment was entered against West American as set forth in the trial court's December 30, 2005 order. West

---

**3.** At this point, Ohio Casualty filed an interlocutory notice of appeal; however, it subsequently discontinued the appeal.

**4.** This portion of the trial court's December 30, 2005 order relates to the April 12, 2004 summary judgment motion, which was actually filed by Ohio Casualty, who was listed as a party prior to the caption being amended to reflect the proper party was West American. West American is a subsidiary of Ohio Casualty. Trial Court Opinion filed 12/30/05 at 5.

American filed a notice of appeal to this Court from the order and amended order. The appeals were docketed at 431 MDA 2006 and 519 MDA 2006.[5]

¶ 12 Thereafter, Ms. Bombar filed motions to quash all three of West American's appeals to this Court, and West American filed a motion to consolidate the appeals. By order entered on May 22, 2006, this Court denied Ms. Bombar's motion to quash the appeal docketed at 224 MDA 2006 without prejudice for her to raise the issue before this panel, granted Ms. Bombar's motions to quash the appeals docketed at 431 and 519 MDA 2006, and denied West American's motion to consolidate as moot.

■ ¶ 13 In her appellate brief, Ms. Bombar has renewed her argument that West American's appeal, docketed at 224 MDA 2004, should be quashed. Specifically, Ms. Bombar argues West American should have filed a timely appeal from the trial court's January 19, 2005 order, which granted summary judgment in favor of Ms. Bombar and declared the rights of the parties as it related to the insurance contract. We conclude the trial court's January 19, 2005 order was interlocutory and West American properly appealed from the trial court's December 30, 2005 order.

■ ¶ 14 "Generally, orders that affirmatively or negatively declare the rights of a party are final and immediately appealable in declaratory judgment actions." *Cresswell v. Pennsylvania National Mu-*

*tual Casualty Insurance Co.,* 820 A.2d 172, 176 n. 2 (Pa.Super.2003) (citation omitted).[6] However, this Court has held that "[a]lthough the [Declaratory Judgment] Act provides that the declaration shall have the 'force and effect of a final judgment or decree,' [a] partial adjudication does not become appealable merely because it is cast in the form of a declaratory judgment." *Moore Motors, Inc. v. Beaudry,* 775 A.2d 869, 870 (Pa.Super.2001) (quotation omitted). Moreover,

> As a general rule, an order dismissing some but not all counts of a multi-count complaint is interlocutory and not appealable. In adhering to this policy, the courts have sought to avoid piecemeal litigation. This Court has held that an appeal will not lie from an order granting partial summary judgment.

*Bolmgren v. State Farm Fire and Casualty Co.,* 758 A.2d 689, 690–691 (Pa.Super.2000) (citations omitted).

¶ 15 In the case *sub judice,* Ms. Bombar sought relief in the form of a declaratory judgment. However, she also raised a bad faith claim and sought damages with regard thereto. While the trial court's January 19, 2005 order declared the insurance policy covered the accident and indicated punitive damages would be assessed against West American for bad faith, the trial court's order did not determine the amount of damages related to Ms. Bombar's bad faith claim until it filed its December 30, 2005 order.[7] Therefore, we

---

**5.** The trial court never ordered a Pa.R.A.P. 1925(b) statement.

**6.** In *Cresswell,* this Court quashed an appeal from the grant of summary judgment as to one of the defendants. However, this Court did not quash the appeal with regard to a different defendant because, although the lower court's December 20, 2001 order declared the rights of the parties, the trial court did not dispose of the plaintiff's bad faith

claims until it filed an order on May 28, 2002. This Court determined that the December 20, 2001 order was a partial grant of summary judgment as to one party. *Cresswell,* 820 A.2d at 176 n. 2.

**7.** We note that, as of the time of the entry of the trial court's January 19, 2005 order, West American's cross-claim against First Insurance Center was still pending. The cross-claim was not decided until the trial court

conclude this case is akin to *Cresswell, supra, Moore Motors, Inc., supra,* and *Bolmgren, supra* since all claims related to Ms. Bombar's complaint were not decided until December 30, 2005. As such, we deny Ms. Bombar's motion to quash West American's appeal, and we shall proceed to the issues presented to this Court by West American.[8]

¶ 16 We have enunciated our standard of review for appeals from the grant of summary judgment as follows:

> Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, uncontroverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

As already noted, on appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. *Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.*

*Cresswell,* 820 A.2d at 177 (quotation omitted) (emphasis in original).

¶ 17 West American first argues the trial court erred in failing to find the commercial insurance policy at issue excludes coverage for the type of claim made by Ms. Bombar. West American specifically argues that Ms. Bombar's bodily injury arose from Upright's product or work, and therefore, Ms. Bombar's injury was included in the products and completed operations hazard exclusion. Since Ms. Bombar's injury was excluded from insurance coverage, West American argues it had no duty to defend or indemnify Upright, and therefore, summary judgment should have been granted in its favor and against Ms. Bombar and Upright. In response, Ms. Bombar contends that Ms. Bombar's injuries arose from an Upright's employee's negligent disconnection of the forklift's backup alarm, and an injury arising from this type of accident (negligent failure to warn or provide instructions) is covered by the insurance policy and not included in the products and completed operations hazard exclusion. Essentially, at issue is whether the trial court abused its discretion or committed an error of law in interpreting the commercial insurance policy at issue.

It is well established that an insurer need only defend an insured in a claim if

---

entered summary judgment in favor of First Insurance Center on December 30, 2005.

8. Ms. Bombar has filed a motion seeking to quash Appellant's reply brief. We deny the motion.

the insurance contract provides coverage for a suit of that nature. To decide whether a duty to defend exists, the court must compare the allegations in the complaint with the provisions of the insurance contract and determine whether, if the complaint allegations are proven, the insurer would have a duty to indemnify the insured.

*Keystone Spray Equipment, Inc. v. Regis Ins. Co.*, 767 A.2d 572, 574 (Pa.Super.2001) (citation omitted).

In the event that the complaint alleges a cause of action which may fall within the coverage of the policy, the insurer is obligated to defend....The duty to defend exists until such time when it is determined that the claim is confined to a recovery that the policy does not cover.

*Unionamerica Ins. Co. v. J.B. Johnson*, 806 A.2d 431, 433–434 (Pa.Super.2002) (citations omitted).

When interpreting the provisions of an insurance policy, we are guided by the following: The interpretation of an insurance policy is a question of law that is properly reviewable by the court ... In construing the policy we are mindful that '[p]olicy clauses providing coverage are interpreted in a manner which affords the greatest possible protection to the insured....The insured's reasonable expectations are the focal point in reading the contract language." .... Our object, as is true in interpreting any contract, is of course, to ascertain the intent of the parties as manifested by the language of the written instrument ... Where a provision of a policy is ambiguous, the policy is to be construed in favor of the insured and against the insurer, the drafter of the agreement.... Where, however, the language of the contract is clear and unambigu-

ous, a court is required to give effect to that language.

*Dorohovich v. West American Ins. Co.*, 403 Pa.Super. 412, 589 A.2d 252, 256 (1991) (quotation and citation omitted). *See Cresswell, supra.*

¶ 18 In the case *sub judice*, the commercial insurance contract provided, in relevant part:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury"... to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury"... to which this insurance does not apply.

\* \* \*

[We will] [p]ay on behalf of the insured all sums which the insured becomes legally obligated as damages because of bodily injury, sickness or disease, including death, at any time resulting therefrom sustained by any person and caused by accident.

¶ 19 Regarding exclusions, the commercial insurance policy specifically stated, in several areas, that the insurance does not apply to bodily injury included within the "products-completed operations hazard." The policy defined the "products-completed operations hazard" as follows:

**"Products-completed operations hazard"**:

a. includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except

1. Products that are still in your physical possession; or

2. Work that has not yet been competed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement but, which is otherwise complete, will be treated as completed.

(emphasis added).

¶ 20 The contract specifically defines "your product" and "your work" as follows:

**"Your Product" means:**

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**"Your product" includes:**

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product;" and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**"Your work" means:**

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work;" and

b. The providing of or failure to provide warnings or instructions.

(emphasis added).

¶ 21 We have reviewed the well-reasoned opinion of the Honorable Carmen Minora and conclude it properly disposes of West American's first issue. Trial Court Opinion filed 1/19/05 at 8–19. In essence, the trial court concluded that, under existing case law, the products and completed operations hazard as presented in this case does not apply to Ms. Bombar's claims regarding the insured's negligent failure to warn, inspect, and install with regard to the forklift's back-up alarm.[9] The trial court concluded that:

[West American's] exclusion is identical to those referenced in the above mentioned cases. [West American's] exclusion, as defined in the policy, was a "Products–Completed Operations Hazard" exclusion which included products and maintenance, service, repair of products occurring away from the in-

---

9. As indicated *supra,* the jury found Upright liable with regard to Ms. Bombar's negligence claims. Ms. Bombar had also raised strict liability, implied warranties, and express warranties claims.

sured's premises. Yet, under this same exclusion the insurer denied coverage for installation negligently completed by the insured, including a count for negligent failure to warn. The thrust of [Ms.] Bombar's complaint and verdicts rests upon negligence including negligent failure to warn of defects in the alarm and negligent installation, service, and maintenance of the alarm, among other counts, and not products liability.

* * *

In reading both the policy and the Complaint, at first glance, it may appear that coverage may not exist. Yet, as noted above in the discussion, the installation of the backup alarm by Upright was a service, but it was not completed at the time the accident occurred because the installation was both faulty and negligent, which the jury concluded and gave rise to the complained of injury.

Trial Court Opinion filed 1/19/05 at 14, 16–17.

¶ 22 Regarding West American's specific averment that the cases cited by the trial court are distinguishable because the wording of the exclusion in this case contained the phrase "[t]he providing of or failure to provide warnings or instructions," we disagree. While the insurance policy at issue refers to "failure to warn," the warnings must still be complete in order to fall within the ambit of the exclusion. Under the policy, the operation is not completed until the work has been put to its intended use at the site by someone, other than another contractor on the same project. Here, the installation of the backup alarm's wiring was not completed at the time of the installation of the wiring because of the negligent failure to warn, and, therefore, the operation was not complete. *See Keystone Spray Equipment, Inc., supra; Eastcoast Equipment Co. v. Mary-*

*land Casualty Co.,* 207 Pa.Super. 383, 218 A.2d 91 (1966).

¶ 23 Having found no abuse of discretion or error of law, we find no merit to West American's first argument.

¶ 24 West American's second argument is the trial court erred in failing to enter summary judgment in favor of West American as to the claim of bad faith. Specifically, West American argues it had a reasonable basis for denying coverage, and therefore, Ms. Bombar did not prove bad faith by clear and convincing evidence. West American's claim of reasonable basis is predicated upon its argument set forth *supra* that the commercial insurance policy excluded coverage in this case and Ms. Bombar's underlying civil complaint did not trigger a duty to defend Upright under the terms of the policy. Moreover, West American claims that, even if it mistakenly concluded the policy provided for no coverage, it acted reasonably in light of the fact the case law in this area was "in flux." In addition, West American points to the fact that, while First Insurance Center learned of the accident shortly after it occurred, West American did not learn of such until Ms. Bombar's counsel forwarded the underlying complaint to West American's Gary Culotta on May 25, 1999, and West American thereafter acted reasonably in its investigation and processing of the claim. West American avers Upright never tendered the complaint to West American in an effort to secure a defense.

We recognize that there is no common law remedy in Pennsylvania for bad faith on the part of insurers. However, the Pennsylvania Legislature has created a statutory remedy in 42 Pa.C.S.A. § 8371 which became effective on July 1, 1990. The statute provides that:

In an action arising under an insurance policy, if the court finds that the

insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371. In the insurance context, the term bad faith has acquired a particular meaning: *Insurance.* "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith. Further, bad faith must be proven by clear and convincing evidence and not merely insinuated. Finally, to recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Terletsky v. Prudential Property and Casualty Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (citations and quotations omitted).

¶ 25 We conclude the trial court has correctly and thoroughly discussed the particular claims raised by West American,

and we rely on the trial court opinion in this regard. *See* Trial Court Opinion filed 1/19/05 at 19–23 (discussing Upright's reporting of the accident to First Insurance Center and West American, and the fact First Insurance Center employees were agents of West American); 23–26 (discussing the law concerning bad faith and West American's actions with regard thereto);[10] Trial Court Opinion filed 12/30/05 at 10–15 (discussing the trial court's legal conclusions regarding bad faith).

¶ 26 West American's next argument is that, even assuming its motion for summary judgment on the issue of bad faith was properly granted, the trial court should not have granted Ms. Bombar's cross-motion for summary judgment. Under the umbrella of this general claim, West American argues (1) the trial court was obligated to consider Ms. Bombar's cross-motion for summary judgment under the same strict standard as the court considered West American's motion for summary judgment; (2) the trial court erred in stating there is no common law remedy for bad faith; (3) the trial court erred in failing to find there are genuine issues of material fact as to whether Ms. Bombar proved bad faith under 42 Pa.C.S.A. § 8371; (4) the trial court erred in permitting Ms. Bombar to pursue damages under 42 Pa.C.S.A. § 8371 since she did not sufficiently plead statutory bad faith in her intervenor complaint; (5) West American had a reasonable basis for denying coverage; (6) the trial court erred in concluding West American had a duty to investigate Upright's claim; (7) the trial court erred in imputing First Insurance Center's conduct to West American; (8) the trial court erred in relying on improper hearsay evidence; (9) the trial court erred in relying

---

**10.** We note that the trial court refers to "Ohio Casualty" instead of "West American" since West American was not identified as the prop-

er party name until after the trial court filed its January 19, 2005 opinion.

on evidence and testimony presented in the underlying trial; and (10) the trial court erred in relying upon disputed facts concerning West American's claims practices.

¶ 27 Regarding West American's claim regarding the applicable standard, there is no evidence that the trial court did not apply the same standard to Ms. Bombar's and West American's motions for summary judgment, and therefore, we summarily dismiss this claim.

¶ 28 Regarding West American's claim that the trial court erred in stating there is no common law remedy for bad faith, the trial court's statement was taken directly from this Court's opinion filed in *Terletsky, supra*. *See* Trial Court Opinion filed 1/19/05 at 23. In any event, West American has not indicated how the result would have been different in this case had the trial court recognized a common law remedy for bad faith.

 ¶ 29 Regarding West American's claim there are genuine issues of material fact as to whether Ms. Bombar proved bad faith under 42 Pa.C.S.A. § 8371, West American points to the fact it denied in its answer to Ms. Bombar's motion for summary judgment that (a) any coverage determination required factual investigation and/or West American's actions were not in compliance with industry standards, (b) Upright's notice of Ms. Bombar's accident given to First Insurance Center was the equivalent of notice upon West American, (c) First Insurance Center was an agent for West American, and (d) Upright's proffered "bad faith expert," James Chett, was correct in his opinions as to claims handling and coverage issues. West American contends its denials created a genuine issue of material fact regarding whether West American's conduct was such as to

"import a dishonest purpose" or whether West American was motivated by "self-interest or ill will." We conclude West American's a, b, and c claims of "genuine issues of material fact" are actually complaints about the trial court's application of the law. The only arguable issue of "fact" is West American's suggestion its expert, Alan Windt, disagreed with Upright's expert, James Chett, on West American's handling of the claim. *See* West American's brief at 41. We conclude this issue is waived. Aside from citing to a page of Ms. Bombar's motion for summary judgment and a page of West American's response to the motion for summary judgment, West American has not developed this argument for appellate review. Such a passing reference in a seventy page appellate brief is insufficient for meaningful appellate review. *See* Pa.R.A.P. 2119.

 ¶ 30 Regarding West American's claim that Ms. Bombar did not sufficiently plead a claim for statutory bad faith under 42 Pa.C.S.A. § 8371, Ms. Bombar alleges West American has not properly preserved this issue in the court below. Specifically, Ms. Bombar suggests West American did not object to the alleged insufficiency of Ms. Bombar's complaint until West American filed improper post-trial motions, and such a challenge was made untimely. West American, on the other hand, asserts it properly preserved the issue by raising it in its pre-trial damages memorandum, which was in response to the first time it was given notice that Ms. Bombar was seeking punitive damages for statutory bad faith. *See* West American's Brief at 43; West American's Reply Brief at 21.

¶ 31 We have reviewed West American's pre-trial memorandum and find no contention that Ms. Bombar's complaint did not sufficiently plead a claim for statutory bad

faith.[11] While the memorandum raised an issue as to whether Upright properly plead in its complaint a claim for compensatory damages, there is no such argument concerning Ms. Bombar's statutory bad faith claim. Since West American has not otherwise cited to a place in the record where it preserved this issue in the court below, we find the issue to be waived. *See* Pa. R.A.P. 302(a).

¶ 32 Regarding West American's claim it had a reasonable basis for coverage, this issue has been exhaustively discussed *supra,* and we decline to address it further.

¶ 33 Regarding West American's claim the trial court erred in concluding West American had a duty to investigate the underlying claim, we conclude the trial court did not err. West American takes issue with the trial court's conclusions that West American "has breached its duty to investigate the claim as it provided it would do under the terms of the insurance policy," and "made no investigation, not even to determine whether the insured would be covered should the facts asserted in the Complaint be true." Trial Court Opinion filed 1/19/05 at 26, 19. West American argues that its only duty to "investigate" was to review "the four corners" of Ms. Bombar's underlying civil complaint and determine whether the alleged facts required coverage under the policy. West American argues there was no other duty to "investigate."

¶ 34 The Unfair Insurance Practices provision in the Pennsylvania Code, 31 Pa. Code § 146.6, provides the following:

§ 146.6. Standards for prompt investigation of claims. Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected.

Moreover, in *Hollock v. Erie Insurance Exchange,* 842 A.2d 409, 415 (Pa.Super.2004) (*en banc*), this Court opined that "the broad language of Section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation. Therefore, we acknowledge ... that [a]n action for bad faith may also extend to the insurer's investigative practices[.]" (*quoting O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa.Super.1999)). Implicit in *Hollock's* holdings is the requirement that the insurer properly investigate claims prior to refusing to pay the proceeds of the policy to its insured. *See Condio v. Erie Insurance Exchange,* 899 A.2d 1136 (Pa.Super.2006) (holding that bad faith includes lack of good faith in investigating the facts of a complaint). Therefore, we conclude the trial court did not err.

¶ 35 Regarding West American's remaining claims that the trial court erred in granting Ms. Bombar's motion for summary judgment on the claim of bad faith, we find West American's issues to be waived.

---

11. We note that, in its proposed findings of fact, which was filed on June 15, 2005, West American submitted "[t]he complaint of Suzanne Bombar as intervenor sought an additional declaration that West American by failing to settle the Bombar case and failing to defend the Plaintiff Upright in the Bombar case, should be guilty of bad faith and should be liable "to the insured to satisfy the entire judgment against the insured." West American's Proposed Findings of Facts filed 6/15/05 at 2. This appears to be an admission that Ms. Bombar properly raised a bad faith claim in her complaint.

¶ 36 While West American proffered several arguments and conclusions regarding alleged trial court errors, West American failed to cite any relevant authority supporting its positions.[12] *See* Pa.R.A.P. 2119; *Burgoyne v. Pinecrest Community Association*, 924 A.2d 675 (Pa.Super.2007) (indicating the failure to develop an argument with citation to and analysis of relevant authority waives the issue on appeal). This Court will not act as counsel and will not develop arguments on behalf of an appellant. *See id.*

¶ 37 West American's next issue is the trial court erred in granting summary judgment in favor of First Insurance Center and dismissing West American's cross-claim for contribution and/or indemnity. We find no relief is due.

¶ 38 In the argument portion of its brief, we note with disapproval that West American makes numerous general conclusions and invites this Court to review over one hundred pages of pleadings and transcripts in determining whether the trial court erred in granting summary judgment in favor of First Insurance Center. For instance, West American states the following in brief:

> First Insurance [Center] argued that it was in an "agent-principal" relationship with West American and could not be held liable unless it was negligent in the procurement of insurance, and that its acts were not the "proximate cause" of Upright's harm. (R. 1889–1890a). West American asserted in response, in its proposed conclusions of law, that West American had a valid claim against First Insurance [Center] for contribution and/or indemnity. (R. 1895a–1912a,

1983a). Ultimately, as part of its December 30, 2005 order, the lower court granted First Insurance [Center's] motion for summary judgment, and dismissed West American's cross-claim for indemnity. (Appendix; R.1951a–1952a; 1960a).

> The lower court erred in dismissing West American's cross-claim against First Insurance [Center] and in finding that West American was vicariously liable in bad faith for the acts of First Insurance [Center]. Pursuant to Pa. R.C.P. 2252(d), a defendant has the right to assert a new matter cross-claim against another party to the case for contribution or indemnity. **West American properly asserted such a cross-claim against First Insurance [Center], as the independent insurance agent of Upright. Despite being advised in 1995 of an accident claim by Upright, First Insurance [Center] did not notify West American of the accident (R. 710a; 713a–714a); advised Upright that no coverage was available, and did not notify West American that it had such a conversation. (R. 580a–581a; 588a). Further West American considered First Insurance [Center] an independent insurance agent, and not authorized to make coverage determinations on behalf of the insurer, which it clearly did. (R. 581a).**

> The lower court, however, disregarded those facts, which at the very least created genuine fact issues for trial as to whether or not First Insurance [Center] was West American's "agent" for vicarious liability purposes. Instead, the

---

12. We recognize that West American cited to *Borough of Nanty–Glo v. American Surety Co.*, 309 Pa. 236, 163 A. 523 (1932), in its sub-issue concerning whether the trial court erred in relying on hearsay evidence. However, citation to this case does not aid this Court in determining whether the specific evidence at issue constituted impermissible hearsay or whether such evidence could be the basis for granting summary judgment.

lower court issued an erroneous and unfounded ruling as to the vicarious liability of West American, and in so doing extinguished any proper basis for relief available to West American.

West American's Brief at 50–51 (emphasis added).

¶ 39 The only portion of West American's brief which indicates any specific argument is the bolded portion of the aforementioned passage. However, the fact First Insurance did not notify West American of the accident, advised Upright there was no coverage, and did not notify West American of this conversation begs the question of whether First Insurance Center was acting as an agent of West American. That is, the specific facts pointed to by West American may raise questions as to whether First Insurance Center acted properly in treating Upright's claim; however, West American has not explained how such facts prove or disapprove a principal-agency relationship between West American and First Insurance Center. Moreover, we have reviewed the pages cited to by West American for its argument that "West American considered First Insurance [Center] an independent insurance agent, and not authorized to make coverage determinations on behalf of the insurer, which it clearly did. (R. 581a)." While an employee of West American may have baldly asserted during the hearing that Mr. Alferio of First Insurance Center was an independent insurance agent, West American has pointed to no facts which support this ultimate conclusion, and, therefore, has failed to prove there was a genuine issue of material fact. Therefore, we find no relief is due.

¶ 40 West American's next issue is whether the trial court erred and/or abused its discretion in awarding damages, which were excessive, unfounded, and miscalculated. Under the umbrella of this general claim, West American raises the following sub-issues: (1) The trial court erred in awarding bad faith damages under 42 Pa.C.S.A. § 8371 since a request for such was included in neither Upright's nor Ms. Bombar's complaint; (2) The trial court erred in imposing and calculating punitive damages against West American; (3) The trial court erred in assessing damages for "vicarious bad faith" against West American for First Insurance Center's actions; (4) The trial court erred in permitting improper witnesses and evidence relating to compensatory damages; and (5) the trial court erred in relying upon the speculative opinions of Upright's witnesses in determining attorneys' fees.

¶ 41 Initially, we conclude sub-issues one and three have been addressed *supra*, and we need not address the issues further.[13] Moreover, we find sub-issue five to be waived since West American has set forth no relevant authority supporting its position regarding the award of attorneys' fees. *See* Pa.R.A.P. 2119; *Burgoyne, supra*. We decline to become counsel for West American in this regard.

¶ 42 Regarding sub-issue two, West American argues the trial court should not have awarded punitive damages and the award thereof was excessive. West American specifically argues that punitive damages should not have been awarded since it did not act in bad faith. The issue of bad faith has been discussed *supra*, and we decline to address it further.

¶ 43 Moreover, regarding sub-issue two, West American argues the trial court should not have based its assessment of punitive damages on the total net worth

---

13. In the alternative, we find sub-issues one and three to be waived since West American has set forth no authority supporting its position. *See* Pa.R.A.P. 2119; *Burgoyne, supra*.

of Ohio Casualty, of which West American is a subsidiary. Rather, West American argues the trial court should not have considered Ohio Casualty's net worth in any regard and should have limited its assessment to West American's net income from premiums, which were collected in Pennsylvania, and not its net income from premiums collected nationwide.

¶ 44 In its opinion, the trial court aptly explained why it relied on the net worth of Ohio Casualty in imposing the amount of punitive damages, and we find no error with regard thereto.[14] *See* Trial Court Opinion filed 12/30/05 at 24–26.

¶ 45 Finally, regarding sub-issue two, West American suggests the trial court erred in relying on the expert testimony of Jonathan Cunitz in determining the amount of punitive damages. West American's entire argument in this regard is as follows:

> Upright's expert, Jonathan Cunitz, testified as to the amount of punitive damages that would not interfere with the ability of the insurer to conduct normal operations, a line of questioning to which West American['s] counsel objected on grounds that such subject matter was not in Cunitz' report, nor was Cunitz qualified to opine as to that subject. The lower court overruled this objection and allowed the testimony. (R. 1465a–1468a). Cunitz then gave his opinion

that, "an award of as much as 10% of the pretax income of any of these entities that is deemed appropriate by the Court would not interfere with that company's ability to conduct normal business operations." (R. 1469a–1470a). This testimony was improper.

West American's Brief at 55.

¶ 46 West American has failed to cite any authority for its assertion that Jonathan Cunitz offered improper expert testimony, which was outside of Mr. Cunitz' report and for which Mr. Cunitz was not qualified. We decline to become counsel for West American on appeal and will not develop this argument for it. *See* Pa. R.A.P. 2119; *Burgoyne, supra.*

¶ 47 Regarding sub-issue five, West American argues the trial court erred in awarding Upright $700,000.00 in compensatory damages. Specifically, West American asserts (1) the trial court erred in permitting Paul Murphy, CPA to testify regarding $700,000.00 in alleged compensatory damages that were never disclosed to West American until two weeks prior to trial by way of Mr. Murphy's report, (2) the trial court erred in permitting Sal Cognetti, Esquire, to testify since he was not identified as an expert until two weeks before trial, and (3) the trial court erred in permitting the depositions of Mr. Conflitti and Watkins to be

14. We note we find *State Farm Mutual. Auto. Ins. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), *Brown v. Progressive Insurance Co.,* 860 A.2d 493 (Pa.Super.2004), and *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890 (1995), to be particularly instructive. In *State Farm Mutual Auto. Ins.,* the U.S. Supreme Court noted that the wealth of the insurance company is one factor to consider in determining the amount of punitive damages. As to determining the amount of wealth, the Supreme Court indicated one should consider the assets of an insurer, i.e., "which, of course, are what other insured

parties in Utah and other States must rely upon for payment of claims." *Id.* at 427, 123 S.Ct. 1513. In *Brown,* this Court held that, in determining who is an insurer and liable for damages for bad faith, this Court must examine: "(1) the extent to which the company was identified as the insurer on the policy documents; and (2) the extent to which the company acted as an insurer." *Id.* at 498 (citations omitted). In *Sprague,* this Court held the wealth of the defendant should be considered in determining punitive damages, and a company's net worth is a valid measure of its wealth. *Id.* at 920.

admitted into evidence. We find these issues to be waived.

¶ 48 Aside from baldly stating the trial court erred with regard to each evidentiary ruling, West American has failed to adequately develop its argument on appeal. Moreover, West American has failed to identify any authority supporting its specific arguments.[15] *See* Pa.R.A.P. 2119. Therefore, we find sub-issue five to be waived.

¶ 49 West American's final argument is that its appeal was timely filed and from a final order. Therefore, West American urges this Court to deny Ms. Bombar's motion to quash. In light of our discussion *supra,* we find it unnecessary to address this claim further.

¶ 50 Affirmed; Motion to Quash Appeal Docketed at 224 MDA 2006 is Denied; Motion to Quash Reply Brief is Denied.

¶ 51 Judge KLEIN files a Dissenting Opinion.

### DISSENTING OPINION BY KLEIN, J.:

¶ 1 I believe that the loss in this case is not covered by the Commercial General Liability (CGL) policy that Upright Materials Handling, Inc. purchased. Instead, it would be covered under a Products Hazard and Completed Operations policy, which Upright did not purchase until *after* this accident. I also believe that The West American Insurance Company used *exactly* the language of the "products-completed operations hazard" exclusion that *this Court* told insurance companies they should use to avoid covering failure to warn. *See Harford Mutual Insurance Co.*[16] *v. Moorhead,* 396 Pa.Super. 234, 578 A.2d 492 (1990). If there is no coverage, there is no "bad faith" in refusing to make payment. Therefore, I must dissent.

¶ 2 In this case, the insurance policy in question specifically excludes failure to warn claims from coverage. The definitions of "Your product" and "Your work" includes: "The providing of or failure to provide warnings or instructions." See policy definitions. The majority states:

> Regarding West American's specific averment that the cases cited by the trial court are distinguishable because the wording of the exclusion in this case contained the phrase "[t]he providing of or failure to provide warnings or instruction," we disagree. While the insurance policy at issue refers to "failure to warn," the warnings must still be complete in order to fall within the ambit of the exclusion. Under the policy, the operation is not completed until the work has been put to its intended use at the site by someone other than another contractor on the same project. Here the installation of the backup alarm's wiring was not completed at the time of the installation because of the negligent failure to warn, and, therefore, the operation was not complete.

Majority at 89.

¶ 3 If the circular logic of the majority and trial court is true, then a failure to

---

**15.** The three cases cited by West American, *Hutchinson v. Penske Truck Leasing Co.,* 876 A.2d 978 (Pa.Super.2005), *appeal granted,* 586 Pa. 771, 895 A.2d 1262 (2006), *McClintock v. Works,* 716 A.2d 1262 (Pa.Super.1998), and *Eldridge v. Melcher,* 226 Pa.Super. 381, 313 A.2d 750 (1973) *(en banc),* stand for the general proposition that a new trial should be granted where evidence has been improperly included or excluded and when the error is harmful to the complaining party. However, West American has failed to explain how any of these cases apply to the particular evidentiary rulings complained of in this case.

**16.** "Harford" is not a typographical error. There is a "Harford Mutual Insurance Company" as well as a "Hartford Mutual Insurance Company."

warn can *never* be excluded. That theory is that if there is no warning: (a) there is negligence so the "products" exclusion does not apply; and (b) the product is not completed so the "completed operations" exclusion does not apply. If the majority and the trial court are correct, then even the clear and unambiguous language of the instant policy, following a specific instruction from our Court, is still unenforceable. That does not make sense. Here, in addition to the "products" exclusion and the "completed operations" exclusion, there is a specific exclusion for failure to warn. There is no reason, public policy or otherwise, that an insurance company should not be able to offer a general liability insurance policy at lower rates without having to charge more to cover possible lawsuits for failure to warn.

**Types of exclusions**

¶ 4 There are two types of exclusion relevant to this lawsuit: products hazard, addressing strict liability claims, and completed operations, addressing negligence in the installation process.

¶ 5 A CGL policy is just that, an insurance policy that provides coverage for general liability. In other words, the CGL is designed to provide coverage if the insured drops a hammer on another person's foot during the installation process or if a person is injured on the insured's premises, but it is not designed to provide coverage if the product itself is defective or if one of the insured's employees installs the product incorrectly. Commonly, such a policy contains certain exclusions for occurrences such as are involved in products liability situations or negligence involved in the installation of the product.[17]

¶ 6 The exclusions referred to above are known as "products hazards" and "completed operations." A products hazard exclusion operates to exclude strict liability claims from coverage. A leading case in products hazard litigation is *Harford, supra.*[18] In that case, the trial court drew a distinction between a strict liability claim for failure to warn and a general negligence claim of failure to warn. Because the products hazard language was recognized as excluding only strict liability claims, the trial court found, and our Court affirmed, that a claim of failure to warn based on negligence was not excluded. In *Harford,* our Court specifically instructed insurers that if they wanted to exclude such negligent failure to warn claims from coverage, they had to do so explicitly.

¶ 7 A completed operations exclusion operates to exclude negligence in the installation of the product. A leading case in completed operations litigation is *Friestad v. Travelers Indemnity Co.,* 260 Pa.Super. 178, 393 A.2d 1212 (1978). In *Friestad,* the negligent installation of a furnace led to a fire that destroyed Freistad's property. Our Court stated that a completed operations exclusion would properly exclude such a claim from coverage.

¶ 8 *Keystone Spray Equipment, Inc. v. Regis Ins. Co.,* 767 A.2d 572 (Pa.Super.2001), presents a twist in the case law. In *Keystone,* our Court held that under a completed operations exclusion, the instal-

---

**17.** There is no requirement that these types of claims be included from a CGL policy nor is there a requirement that the claims be excluded. It is a question of policy language. Also, it appears to be a method of allowing insureds to customize their insurance policies to fit their particular needs. Just as an automobile owner can purchase limited tort coverage, underinsured or uninsured motorist coverage to fit specific needs and budget, the business owner can choose to purchase separate coverage for product liability claims and/or completed operations claims.

**18.** A detailed analysis of the case law cited here is provided in the next section.

lation could not be "completed" if proper warnings had not been given. Thus, the completed operations exclusion, which generally guards against negligence in the installation process, could not apply because the operation had never been completed. The stated rational used in Keystone was that the danger from a failure to warn could not be discovered until an injury had occurred. Thus, it would be unfair to allow an insurer to disclaim.

¶ 9 The insurance policy in question contains a hybrid "products hazard/completed operations" exclusion, encompassing both types of exclusion. In addition, it contains the language Harford directed insurers to use if they wanted to exclude negligent failure to warn claims from coverage. In fact, the policy uses the Harford language so that it applies to products hazard and completed operations.

¶ 10 If the majority and the trial court are correct in the interpretation of the policy and application of prior case law, as noted the result would be that a failure to warn claim can never be excluded from coverage in a CGL policy. Neither the products exclusion nor the completed operations exclusion would work to avoid coverage, and specific language excluding coverage for failure to warn would be ignored.

**Application of the law**

¶ 11 One of the problems in understanding the application of these exclusions is that prior case law addressed each exclusion separately. That may be because each exclusion represented a type of coverage that was available separately or because the specific lawsuits that interpreted the exclusions only presented the trial court with an issue related to one specific exclusion. This becomes problematic in our present case because the exclusions are grouped together, making a hybrid "products hazard/completed operations" exclusion. Distinctions drawn in prior

case law between the types of excluded claims are not relevant here because both types of exclusion are present.

¶ 12 I believe that the ruling of the trial court and affirmed by the majority contradicts the explicit directive made by our Court in *Harford*. *Harford* dealt with the application of a products hazard exclusion. A wine making supplier was sued over sulphur strips, which are (or were) used to kill bacteria in fermenting vessels. When a particular user of the strips lit one of the strips and placed it in a barrel, the strip ignited the alcohol fumes that were in the barrel and the barrel exploded, injuring several people. In the underlying lawsuit, it was claimed that the supplier negligently failed to inform the user of the dangers of using the strips. The insurer, Harford, sought to escape coverage by virtue of the products hazard exclusion. Our Court held against Harford, explaining that the products hazard exclusion dealt with strict liability claims, not negligence claims and if Harford wanted to exclude such negligence claims, it must expressly do so. Specifically, our Court stated:

> The problem for Harford is that the failure to warn claims are not essentially negligence claims or essentially product liability claims. Rather, they are essentially both and fall in a region of analytical overlap between two commonly distinct theories of liability. As the drafter of the contract, *it was incumbent upon Harford to expressly include that region of overlap in the exclusion if that was its intent.*

*Harford*, 578 A.2d at 503. [Emphasis supplied.]

¶ 13 Thus, our Court instructed insurers to specifically include such negligence in the exclusion if those insurers wanted to forego covering negligent failure to warn claims. *That is exactly what West American did* in this case. West American took

our Court at its word and specifically included language excluding warnings or failures to warn. Despite following our instructions, the trial court and the majority are now telling insurers that even if such claims are expressly excluded from coverage, that language means nothing. Therefore, I believe the view of the trial court and majority squarely conflicts with Harford.

¶ 14 *Keystone, supra,* does not change the result. *Keystone* found that the failure to warn meant that the installation process had not been completed, therefore the "completed operations" exclusion (which otherwise provides exclusion from coverage for negligently providing a service in conjunction with a product) could not apply. There are a number of problems with that argument, however. First and foremost is the fact that the insurance policy in *Keystone* did not contain the limiting language found in the instant case.[19] By applying *Keystone* to the facts in this case, we are essentially completely ignoring the language of the insurance contract, because there is no situation where a failure to give warning exclusion would be valid. If a supplier or manufacturer fails to give a proper warning, then the product can never be completed, thus a failure to warn can never be part of a completed operations exclusion. This interpretation makes little, if any, sense after our Court specifically told insurers to include failure to warn in the exclusions.

¶ 15 Further, the rules of contract interpretation are well settled. The parties have a right to make their own contract, and it is not the function of the court to rewrite it or give it a construction in conflict with the accepted and plain meaning of the language used. *Meeting House*

*Lane, Ltd. v. Melso,* 427 Pa.Super. 118, 628 A.2d 854, 857–58 (1993). One part of a contract cannot be interpreted so as to annul another part, and *a contract must be construed, if possible, to give effect to all of its terms. Id.* (emphasis added). When interpreting a contract of insurance it is necessary to consider the intent of the parties as manifested by the language of the instrument. *Where the policy language is clear, the contract will be applied as written. Pempkowski v. State Farm Mutual Auto. Ins. Co.,* 451 Pa.Super. 61, 678 A.2d 398, 400 (1996) (emphasis added). When interpreting a contract, a court must construe it as written, *giving effect to the clear language and plain meaning of the words. Solomon v. U.S. Healthcare Systems of Pa.,* 797 A.2d 346, 349 (Pa.Super.2002) (emphasis added).

¶ 16 There has been no claim and no finding that the limiting language in question, referring to warnings or failure to give warnings, is against public policy. No such argument could be credibly made given that our Court directed insurers to use the language, if they so desired. As such, the language violates no prior case law. The language violates no statutory provisions. The policy language is clear and unambiguous. Therefore, there is no reason to apply *Keystone,* which did not involve an interpretation of the language in question in such a manner as to ignore that language. By effectively writing the language out of the contract, we violate the standard rules of contract interpretation.

¶ 17 The application of *Keystone* to this situation creates a legal Catch–22. In essence we are telling insurers they can limit exposure on a CGL by specifically excluding products hazards and completed opera-

---

**19.** Other problems with applying *Keystone* to this factual situation will be discussed later in this dissent.

tions (and specifically failure to warn claims) and then telling insurers that they cannot enforce the exclusion because doing so indicates the operation was not completed.

¶ 18 The history of the application of the products-completed operations hazard analysis found in the trial court opinion and cited by the majority is a thorough examination of this insurance policy exclusion. I have no disagreement with the analysis, as far as it goes. However, I believe that facts found in this case compel a different result.

¶ 19 Initially, there was a distinction between an exclusion for strict liability failure to warn under *Restatement, Torts* § 402A and negligent failure to warn. Therefore, it was held that excluding *strict liability* from coverage did not exclude coverage for *negligence. See Harford, supra.* The situation is further complicated between the difference in coverage for the "product" and for "completed operations."

¶ 20 *Keystone, supra,* relied upon by both the trial court and the majority, takes one view of the application of the exclusion. Basically, the 'products' portion of the exclusion covers the thing itself, in this case, a forklift and backup alarm. The "completed hazards" portion of the exclusion applies to the service of the thing. Often, completed hazards refer to the installation of the product.

In *Friestad v. Travelers Indemnity Company,* 260 Pa.Super. 178, 393 A.2d 1212 (1978), we considered an identical provision after the insured negligently installed a furnace which later caused a fire that destroyed the home in which it was installed. We distinguished the "products" and "completed operations" exclusions by stating that the "principal thrust of the completed operations is the insured's provision of a service, while the principal thrust of the products haz-

ard in the insured's manufacture or sale of a product." *Id.* at 1213.

*Keystone,* 767 A.2d at 575.

¶ 21 Sometimes an exclusion may cover a product but not "completed operations" if there is still work to be done, for example on installation. However, that is not the instant situation. Whether the accident occurred because of the product itself or because of later work, the language of the exclusion clearly provides that there is coverage for neither. In *Friestad,* the installation of the furnace was allegedly negligently performed, thereby causing a fire. Our Court determined that the alleged negligence fell within the ambit of the completed operations exclusion. Therefore, a negligent act does not automatically negate the application of the exclusion.

¶ 22 The cases seem to have carved out an odd distinction in determining what the "completed operations" exclusion means. Tangible negligence, such as failing to tighten a screw properly on a furnace, is excludable under the "completed operations" exclusion. *See Friestad.* However, intangible negligence, such as failing to warn a person not to stick his hand in a moving conveyor belt, is not excludable. *See Keystone.* This is a fine hair to split.

¶ 23 Apparently, at one time "products" and "completed operations" were separate exclusions. In *Harford* the policy only contained the "products" exclusion. In *Harford,* it was held that the products exclusion only covered the product itself, not the separate negligent act of failing to warn. Thus, because the policy did not address that aspect of negligence, the policy was construed against the insurer and coverage was deemed appropriate.

While we find that the instant exclusion clearly precludes claims which allege the product was defective for failing to include instructions or warnings, the best

that can be said for this exclusion with regard to negligent failure to warn claims is that reasonable men could differ as to its proper scope.

To hold for Harford, here, would require this Court to find that a failure to warn negligence claim, which *ostensibly* asserts negligence in failing to reasonably *instruct* or *warn*, is *essentially* a product liability claim for failure to properly *manufacture* (with necessary warnings) and was intended to be excluded by the Products Hazard exclusion.

*Harford,* 578 A.2d at 502–03 (emphasis in the original).

¶ 24 It seems that in *Harford* there was a distinction between exclusions for strict liability under 402A and negligence, where there was the negligent failure to warn. The distinction was necessary not because negligent acts cannot, at times, be excludable. This is proven by our Court instructing insurers to use language to specifically exclude negligent failure to warn. Rather, the specific act complained of, a failure to warn, is found in both a strict liability claim (which is properly excludable) and a negligence claim (which was not specifically alluded to in the exclusionary language). The differentiation between negligent failure to warn and strict liability failure to warn is also a fine distinction, given how close the factual predicates are for a claim of failure to warn, but the distinction was determined to be legally supportable.

¶ 25 *Keystone* lifted the distinction from the "products" exclusion and grafted it onto the "completed operations" exclusion. This appears to be an odd solution given that the products exclusion relied on a strict liability/negligence distinction and

that distinction is not involved in the "completed operations" exclusion, which is designed to apply to the negligent performance of a service. *Keystone* attempts to explain the rationale by stating:

> Moreover, the *Eastcoast* Court indicated, in dictum, that this rule applies equally to negligent misrepresentation and negligent failure to warn theories because the underlying policy is the same to prevent an insurer from refusing coverage for an injury caused by negligence at the time of installation simply because the injury cannot be discovered until the installation is complete and the installed equipment is put into service.

*Keystone,* 767 A.2d at 575 (citing *Eastcoast Equipment Co. v. Maryland Casualty Co.,* 207 Pa.Super. 383, 218 A.2d 91 (1966)). What this reasoning fails to recognize is that there is no real difference between a negligent failure to warn (which is not subject to exclusion) and negligent failure to tighten a screw (which is subject to exclusion).[20] Both acts of negligence may be undiscoverable until "after the installation is complete and the installed equipment is put into service." Yet case law clearly indicates that the "tangible" act of negligence is properly addressed by the completed operations exclusion. As long as "tangible" negligence is properly excludable, the fact that an act of negligence may not be immediately discoverable, the rationale relied on in *Keystone,* cannot logically be a differentiating factor.

¶ 26 I believe the rationale used in *Keystone* is fundamentally flawed and at some point should be revisited by an *en banc* panel of this Court or the Pennsylvania Supreme Court.[21] However, even if *Key-*

---

**20.** It also ignores the fact the original reason for the distinction was because of the overlap of failure to warn in strict liability and negli-

gence. This overlap does not and cannot exist between negligence and negligence.

**21.** It is possible that the result of *Keystone* is proper and merely the rationale is incorrect.

*stone* remains good law, it does not apply to this case because neither *Keystone,* nor any other prior case cited, involves the specific exclusion found in this insurance policy. Applying *Keystone* to the present facts improperly conflicts with prior and settled case law. *See Harford, supra; Meeting House Lane, supra; Pempkowski, supra; Solomon, supra.*

¶ 27 Another problem with the trial court and majority solution is that it is transforming a CGL policy into another form of insurance, a products hazard and completed operations policy. There is insurance available to cover the types of negligence and strict liability claims excluded from this CGL policy. Evidence presented in this matter indicates that such products hazard and completed operations coverage was originally offered to Upright and rejected. Upright purchased that coverage after the accident that is the basis for this lawsuit.

¶ 28 The transformation of one type of coverage into another is disapproved of by our courts. In the realm of motor vehicle insurance, an insured may not convert underinsured motorist coverage into liability coverage. *Rudloff v. Nationwide Mut. Ins. Co.,* 806 A.2d 1270 (Pa.Super.2002). A CGL cannot be converted into professional services coverage. *Atlantic Mut. Ins. Co. v. Gula,* 926 A.2d 449 (Pa.Super.2007). A CGL cannot be converted into a performance bond. *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union,* 589 Pa. 317, 908 A.2d 888 (2006). Our Supreme Court stated:

Such claims simply do not present the fortuity contemplated by the ordinary definition of "accident" or its common judicial construction in this context. *To hold otherwise would be to covert a policy for insurance into a performance bond. We are unwilling to do so, especially since such protections are already available for the protection of contractors.*

*Kvaerner,* 908 A.2d at 899 (emphasis added).

Relying on that reasoning, our Court then stated:

The CGL is not meant to insure the actual quality of the thing provided; in the construction business there are other ways for that, notably a performance bond. Here, the CGL is not meant to be converted into professional negligence insurance. The CGL policy is not designed to insure the quality of the case management service provided. The record demonstrates that there is specific insurance that does cover the possibility of negligent provision of case management. Novaeon has such coverage from St. Paul Fire and Marine. Unfortunately, that coverage was not purchased for the time frame applicable to this claim. The fact that Novaeon did not have the proper coverage in place for this claim does not mean that any other policy that covered Novaeon must provide coverage for professional negligence. The person who suffers a loss due to a house fire cannot convert his automobile insurance into a homeowner's policy to pay for the repairs to his home.

*Atlantic Mutual,* 926 A.2d at 453.

¶ 29 Coverage for product hazards and completed operations was available to Upright. It chose not to purchase that cover-

---

If *Keystone* is viewed as the flip side of *Harford,* then coverage may well have been appropriate. By this I mean, *Harford* did not specifically exclude the negligent failure to warn in a strict liability exclusion. In *Key-* *stone,* the real problem might have been the failure in include strict liability language in the negligence driven completed operations exclusion.

age. This is the same scenario presented in *Atlantic Mutual.* Upright, and by extension Bombar, who obtained bad faith rights from Upright, cannot be heard to complain that West American acted badly in failing to cover a claim for which Upright bought no coverage. Further, Upright/Bombar are not allowed to convert a general liability policy into specific coverage for products hazards and completed operations.

¶ 30 I believe that: (a) our Court in *Harford, supra,* specifically instructed insurers that if they wanted to exclude failure to warn and like claims from CGL coverage, to use the exclusionary language used in the instant policy; (b) we are bound to give effect to language in an insurance contract as long as that language does not violate public policy, statutory requirements or prior case law; (c) this exclusionary language does not violate public policy, statutory requirements or prior case law; and (d) *Keystone* did not address the specific language of this policy and does not require a different result. Therefore, to rule as the trial court and the majority would, in effect, judicially negate otherwise proper contract language. I would find the exclusionary language in question to be valid and enforceable. Because I believe the exclusion to be enforceable, I would find West American did not act in bad faith in refusing to defend and indemnify the underlying claim.

¶ 31 Therefore, I dissent.